**79 NEW YORK SUPPLEMENT** (Sup. Ct.
and 113 New York State Reporter

down the rear of the plaintiffs' premises, and from undermining the stairway, foundation, walls, or support of said building, during the pendency of the action. When this injunction was continued, the plaintiffs were in possession of the premises 16 Avenue C, as tenants. On the 1st of August, 1902, the defendant commenced proceedings to dispossess the plaintiffs from the premises, which resulted in a final order directing a warrant to issue, dispossessing the plaintiffs. Such warrant was issued, and the plaintiffs were removed from the premises on August 27, 1902. Having thus obtained possession of the premises by these proceedings, the appellant proceeded, in disregard of the injunction, to do what he was enjoined from doing.

The prohibition contained in the injunction was plain, and until it was vacated, either by a final judgment in the action, or by an order of the court, it was binding upon the appellant. If the appellant's status was so changed that he should have been relieved from the operation of the injunction, it was his business to apply to the court to vacate or modify it, and not take the law in his own hands and violate it. There was absolutely no excuse for such a violation, except that he did it under the advice of his counsel. In such a case the advice of counsel is no excuse. The only result ought to be the punishment of both attorney and client, prescribed for the violation of the injunction. It is not pretended that what was done was not a direct violation of the injunction. It is only when there is a question as to whether the act complained of is actually a violation of the injunction that advice of counsel can be accepted as an excuse. No such question is presented in this case. The appellant clearly violated an order of the court, and no excuse is presented that is entitled to consideration. The court below might well, in addition to the fine, have taught the appellant, by an actual imprisonment, that the orders of the court in this state must be respected.

It follows that the order appealed from must be affirmed, with $10 costs and disbursements. All concur.

---

GROSSMAN v. CAMINEZ et al.

(Supreme Court, Appellate Division, Second Department. January 16, 1903.)

1. CONSTITUTIONAL LAW—"DUE PROCESS"—DEPRIVATION OF LIBERTY—REAL ESTATE AGENTS—WRITTEN AUTHORITY.

Laws 1901, c. 128, amending Pen. Code, § 640, by providing that in cities of the first and second class any person who shall offer for sale any real property without the written authority of the owner of such property, or of his attorney in fact, appointed in writing, or of a person who has made a written contract for the purchase of such property with the owner thereof, shall be guilty of a misdemeanor, is unconstitutional, as a deprivation of liberty and property without due process of law.

Appeal from municipal court, borough of Brooklyn.

Action by Morris Grossman against Jacob Caminez and another. From a judgment for defendants, plaintiff appeals. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, WOODWARD, and HIRSCHBERG, JJ.

Louis J. Altkrug, for appellant.

Herman S. Bachrach, for respondents.

WOODWARD, J.   It is conceded that the plaintiff is a real estate broker, doing business in the borough of Brooklyn, and that he was orally authorized by the defendants to find a purchaser for two houses owned by the defendants, and that subsequent to January, 1902, he did procure a purchaser ready, willing, and able to purchase on defendants' terms.   It appears that the defendants for some reason refused to make the sale, and it is conceded that the plaintiff has demanded payment of his commissions, amounting to $135, which has been refused.   It is not necessary to cite authorities for the proposition that the plaintiff has earned and is entitled to his commission under the circumstances conceded to exist, unless this right has been defeated by the provisions of chapter 128 of the Laws of 1901, which undertakes to amend section 640 of the Penal Code by adding a provision that "in cities of the first and second class any person who shall offer for sale any real property without the written authority of the owner of such property, or of his attorney in fact, appointed in writing, or of a person who has made a written contract for the purchase of such property with the owner thereof, shall be guilty of a misdemeanor."   It will be assumed that the plaintiff cannot invoke the aid of the courts to enforce an unlawful contract, and we will pass directly to the question raised at the trial, and urged upon this appeal, that the statute above cited is unconstitutional and void.   In the year 1887 the legislature of this state enacted chapter 691, which is entitled "An act to amend the Penal Code by adding an additional section thereto to be known.as 'section three hundred and thirty-five A.'"   It was provided in this section that:

"No person shall sell, exchange or dispose of any article of food or offer or attempt to. do so upon any representation, advertisement, notice or inducement that any thing other than what is specifically stated to be the subject of the sale or exchange is or is to be delivered or received or in any way connected with or a part of the transaction as a gift, prize, premium or reward to the purchaser.   Any person violating any of the provisions of this section shall be deemed guilty of a misdemeanor and, in addition thereto, shall be liable to a penalty of twenty-five dollars, to be recovered, with costs, by any person suing therefor in his own name."

One Gillson was arrested, and convicted of a violation of this statute, and his conviction was affirmed by the general term of the supreme court.   On an appeal to the court of appeals (People v. Gillson, 109 N. Y. 389, 17 N. E. 343, 4 Am. St. Rep. 465) the limitations of legislative power were fully discussed and considered, and the court say:

"Nor can this act stand as a valid exercise of legislative power to enact what shall amount to a crime.   The power of the legislature to so declare is exceedingly large, and it is difficult to define its exact limit.   But that there is a limit even to that power under our constitution we entertain no doubt, and we think that limit has been reached and passed in the act under review. The power has been unlawfully exercised in this instance for the same reasons that we have already stated, because it violates the constitutional provision which secures to each person in this state his liberty and property, except as he shall be deprived of one or both by due process of law."   Page 406, 109 N. Y., and page 349, 17 N. E.. 4 Am. St. Rep. 465.

"'A person living under our constitution has the right to adopt and follow such lawful industrial pursuit, not injurious to the community, as he may see fit. The term 'liberty,' as used in the constitution, is not dwarfed into mere freedom from physical restraint of the person of the citizen, as by incarceration, but is deemed to embrace the right of a man to be free in the employment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare. Liberty, in its broad sense, as understood in this country, means the right not only of freedom from servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways to live and work where he will, to earn his livelihood in any lawful calling and to pursue any lawful trade or avocation." People v. Gillson, 109 N. Y. 389, 399, 17 N. E. 343, 345, 4 Am. St. Rep. 465, and authorities there cited. These remarks apply equally to those provisions of the fourteenth amendment:

"Nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

It is accordingly enacted by section 1977 of the United States Revised Statutes [U. S. Comp. St. 1901, p. 1259] that:

"All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220.

In Allgeyer v. Louisiana, 165 U. S. 578, 589, 17 Sup. Ct. 427, 431, 41 L. Ed. 832, the court say:

"The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned."

The same case quotes Mr. Justice Bradley in Butchers' Union Co. v. Crescent City Live Stock Landing Co., 111 U. S. 746, 762, 4 Sup. Ct. 652, 657, 28 L. Ed. 585, as saying:

"The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence, which commenced with the fundamental proposition that 'all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness.' This right is a large ingredient in the civil liberty of the citizen."

Again, the same authority quoted as above, says:

"'I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States."

At page 765, 111 U. S., and page 658, 4 Sup. Ct., 28 L. Ed. 585, of the quoted case, referring to the provision of the fourteenth amend-

ment which denies the right of the states to make or enforce any law abridging the privileges and immunities of citizens of the United States, Mr. Justice Bradley says:

"But if it does not abridge the privileges and immunities of a citizen of the United States to prohibit him from pursuing his chosen calling, and giving to others the exclusive right of pursuing it, it certainly does deprive him (to a certain extent) of his liberty; for it takes from him the freedom of adopting and following the pursuit which he prefers, which, as already intimated, is a material part of the liberty of the citizen."

The court in the Allgeyer Case, supra, adds:

"It is true that these remarks were made in regard to questions of monopoly, but they well describe the rights which are covered by the word 'liberty' as contained in the fourteenth amendment."

These declarations of the courts in dealing with these constitutional clauses for the protection of individual rights are fully in harmony with that magnificent assertion of individual rights contained in the first section of the first article of our state constitution, which declares:

"No member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers."

While it is true that in some instances, under the police power, this rule appears to have been deviated from, we are unable to find any case in which the courts have held that it was within the power of the legislature to make an act, innocent and harmless in itself, a necessary or commonly used instrumentality of carrying on the ordinary vocations of life, a crime in one portion of the state and not in another. Even the statute involved in the Gillson Case, supra, did not attempt this, and that act was, as we have already pointed out, condemned as in violation of the constitutional guaranties. This is not a new statute of frauds, dealing alike with all persons; it is an attempt to deny to men engaged in a perfectly legitimate and lawful business—one of the ordinary occupations of life—in cities of the first and second class the same power to make verbal contracts which is specially allowed under the statute of frauds. It is a denial, under a criminal penalty, of a right or privilege guarantied to citizens generally to make verbal contracts which are to be performed within a year, and is, as suggested by Mr. Justice Bradley, an abridgment of the privileges and immunities of citizens of the United States, as well as a violation of the guaranties of the state constitution already alluded to in this discussion. The extent and limits of what is known as the "police power" have been a fruitful subject of discussion in the appellate courts of nearly every state in the Union. It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement of a public nuisance. Under this power it has been held that the state may order the destruction of a house falling to decay or otherwise endangering the lives of passers-by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; the destruction of decayed or unwholesome food; the prohibition of wooden buildings in cities; the regulation of railways and other means of public con-

veyance, and of interments in burial grounds; the restriction of objectionable trades to certain localities; the compulsory vaccination of children; the confinement of the insane, or those inflicted with contagious diseases; the restraint of vagrants, beggars, and habitual drunkards; the suppression of obscene publications and houses of ill fame; and the prohibition of gambling houses and places where intoxicating liquors are sold. Beyond this, however, the state may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine, not only what the public interests require, but what measures are necessary for the protection of such interests. Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923; Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346. To justify the state, however, in interposing its authority in behalf of the public, it must appear: First, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, nor impose unusual and unnecessary restrictions upon lawful occupations. Lawton v. Steele, 152 U. S. 133, 136, 137, 14 Sup. Ct. 499, 38 L. Ed. 385; Colon v. Lisk, 153 N. Y. 188, 197, 47 N. E. 302, 60 Am. St. Rep. 609, and authorities there cited. Is there any interest of the public, considered as a whole, which demands this legislation, or is its object merely to enable people like the defendants in this action to avoid their just obligations, and to protect a few individuals from dishonest brokers? A real estate broker has no power to sell property. His mission is to bring to the owner a person able and willing to purchase the property on the owners' terms; and the fact that overzealous brokers have imposed upon a few individuals, as compared with the many, is no reason why an entire class of business men should have their power to make contracts abridged by a penal statute. If there are dishonest brokers, it should be remembered that there are likewise dishonest owners of real estate, and the state has discharged its duty in the premises when it has afforded impartial tribunals for the adjustment of controversies and the punishment of crimes, without arbitrarily interfering with legitimate business occupations and depriving citizens of the liberty of action which is necessary in the conduct of modern business affairs in a great city. This feature of the case now before us was fully treated by the court of appeals in People v. Warden of City Prison, 157 N. Y. 116, 51 N. E. 1006, 43 L. R. A. 264, 68 Am. St. Rep. 763, and in fact the principle involved was completely disposed of in the discussion of that case, to which reference is made without fuller quotation for the reasons which compel the rejection of the act in question as the law of this state. See People v. Havnor, 149 N. Y. 195, 199, 200, 43 N. E. 541, 31 L. R. A. 689, 52 Am. St. Rep. 707, and authorities cited; People v. Gillson, 109 N. Y. 389, 399, 17 N. E. 343, 4 Am. St. Rep. 465, and authorities there cited; Health Department of City of New York v. Rector, etc., of Trinity Church, 145 N. Y. 32, 39, 39 N. E. 833, 45

Am. St. Rep. 579, and authorities there cited. No necessity appears to us for this kind of an abridgment of the rights and privileges of real estate brokers for the protection of the public, and the means are unnecessarily oppressive upon individuals. In determining the reasonableness of this statute—and it is the question upon which the validity of the act depends—we are at liberty to consider the established usages, customs, and traditions of the people, and to have in view the promotion of their comfort and the preservation of the public peace and good order (Plessy v. Ferguson, 163 U. S. 537, 550, 16 Sup. Ct. 1138, 41 L. Ed. 256), but in no aspect in which the case may be viewed are we able to discover any warrant for the statute, in which we have, to quote the language of the court in Colon v. Lisk, supra, "another example of class legislation where the legislature has attempted to improperly interfere with the private rights of the citizen."

The judgment appealed from should be reversed, and a new trial ordered; costs to abide the event. All concur; BARTLETT, J., in result.