(86 App. Div. 335.)

### CODY v. DEMPSEY et al.

(Supreme Court, Appellate Division, Second Department. July 24, 1903.)

1. REAL ESTATE BROKERS—COMMISSIONS—WHEN EARNED.

An owner of property employed a broker to sell or exchange it. As a result, the owner and a third person contracted for the exchange of their properties. The contract stipulated that the deeds should be exchanged on or before a certain date. The broker waived his right to commission in the event of a failure to perform the contract. The contract was not consummated at the time specified, but thereafter the owner and the third person entered into a new agreement collateral to the original, by which the time for the exchange of the property was extended, and by which the contract was modified. As thus modified, it was carried out. *Held*, that, in absence of any statutory interference, the broker, on the performance of the modified contract, was entitled to his commissions.

2. SAME—WRITTEN AUTHORITY—QUESTION FOR JURY.

In an action by a broker for the recovery of commissions earned in procuring an exchange of real property, evidence *held* to require the submission to the jury of the question whether the attorney in fact of the owner executed a certain paper, and delivered it to the broker with the intention of authorizing him to negotiate the transfer.

3. SAME—WRITTEN AUTHORITY—SUFFICIENCY.

A paper signed by the attorney in fact of the owner of property, which recited, "They will take 86 st subject to 1st and 2nd mortgages. We to take 26th ward lots subject to taxes　*　*　*　not to exceed $6,500," and which was delivered to a real estate broker with the intention of authorizing him to negotiate the transfer, sufficiently authorized the broker in writing to negotiate the transfer, within Pen. Code, § 640d. (Laws 1901, p. 312, c. 128), making it a misdemeanor for a person to offer real estate for sale without written authority.

4. SAME—RECOVERY OF COMMISSIONS.

Pen. Code, § 640d (Laws 1901, p. 312, c. 128), which makes it a misdemeanor for a person to offer for sale any real property without written

---

¶ 1. See Brokers, vol. 8, Cent. Dig. § 68.

authority, does not prevent a broker offering property for sale without such written authority from recovering his commissions on the complete performance of the contract of sale procured by him.

**5. SAME—CONSTITUTIONAL LAW.**

Pen. Code, § 640d (Laws 1901, p. 312, c. 128), providing that in cities of the first or second class any person offering for sale real property without written authority shall be guilty of a misdemeanor is unconstitutional, as improperly abridging the rights and privileges of citizens of one portion of the state in respect to the making of contracts.

Appeal from Trial Term, Queens County.

Action by Nicholas V. Cody against Mary E. Dempsey, impleaded with Frederick Beltz. From a judgment dismissing the complaint on the merits at the close of the whole case, plaintiff appeals. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, WOODWARD, and HIRSCHBERG, JJ.

James W. Ridgway, for appellant.
Andrew J. Shipman, for respondent.

WOODWARD, J. This action is brought to recover $2,500 as commissions alleged to be due for services rendered by Thomas F. Cody, plaintiff's assignor, in effecting an exchange of property in the boroughs of Manhattan and Brooklyn. There is no dispute that Thomas F. Cody was employed by William Dempsey, attorney in fact for Mary E. Dempsey, the owner of a tenement house in the borough of Manhattan, to effect a sale or exchange of this property, and it is not disputed that Thomas F. Cody did bring together the parties who subsequently entered into an agreement, which was carried out, by which the properties were exchanged. It is admitted that the compensation agreed upon was $2,500, but it is urged as a defense that the plaintiff's assignor was not authorized in writing, as required by section 640d of the Penal Code (Laws 1901, p. 312, c. 128), and that the contract entered into between the exchanging parties was not carried out. At the close of the whole evidence the learned court dismissed the complaint on motion of defendant, to which exception was taken, and this appeal brings up the question whether the plaintiff had established his cause of action, or had produced evidence which entitled him to go to the jury upon the issues.

It appears from the evidence that Mr. Dempsey, the attorney in fact of his wife, the owner of the tenement house "Marie," met Thomas F. Cody, and requested him to make an effort to sell the "Marie," or to exchange the same for other property in such a way as to realize $35,000 or $40,000 in ready money, with which certain incumbrances might be paid off. Cody was told that no transaction which did not result in producing this amount of money would be of any use, and he went to work with this object in view. As a result of his labors, it is conceded that a contract was entered into between Mary E. Dempsey and Florence L. E. Willmann, acting through her attorney, Frederick Beltz, on the 20th of January, 1902. This contract provided the terms for the exchange of the properties, mentioning the incumbrances, etc., and it was stipulated that this "agreement is also predicated upon the procurement by the party of the first part of a loan of forty thousand ($40,000) dollars at not over 5 per cent. interest

on the said Brooklyn lots, which loan the party of the second part will endeavor to procure or cause to be procured, if possible, but at the expense and cost of the party of the first part; said expenses and cost not to exceed two per cent. of said loan and the necessary disbursements; and which loan is to be made simultaneously with the closing of title mentioned herein. But upon failure to procure said loan by either party from any source whatever each of the parties will be released from any and every obligation, covenant, or agreement thereunder, express or implied. Said deeds shall be delivered and exchanged at the office of Frederick Beltz * * * on or before February 3d, 1902, at 11 a. m." At this time, in the absence of any statutory interference, or different agreement on the part of Cody, the commission had been earned. He had brought together the parties, and they had entered into a contract mutually satisfactory, and under well-established rules he had done all that was necessary to entitle him to his commission. It appears, however, from the evidence that Cody agreed to waive his commission in the event of the failure of this contract by reason of the loan not being secured, and a clause was inserted in the agreement between Mrs. Dempsey and Miss Willmann that "it is understood that no brokerage is to be paid to any one unless this contract shall be performed." This could not, of course, bind the plaintiff, except in so far as his assignor had agreed to the proposition; but no question is raised on this point. It is conceded that the contract of January 20, 1902, was not consummated on the 3d day of February, as provided by its terms, but it appears from the evidence that the negotiation thus entered into was continued, and that on the 20th day of March, 1902, the parties, through their respective attorneys, entered into a "memorandum of modification agreement between Mary E. Dempsey and Florence L. E. Willmann, to be annexed and collateral to agreement of exchange of property dated January 20th, 1902, and extended to April 1, 1902," so that it is apparent that in March of that year the defendant recognized the original contract as still in force; and it is conceded that the "modification agreement," which provided for a loan of $35,000 instead of $40,000, with some other incidental matters, was carried out, and the transfer made as originally agreed upon. Plaintiff's assignor had clearly, at that time, brought to the defendant a party ready, willing, and able to purchase or exchange his property upon the terms named by the latter; and the authorities all hold that under such circumstances he has earned his commissions. Grossman v. Caminez, 79 App. Div. 15, 16, 79 N. Y. Supp. 900. The fact that the contract of January 20th was not consummated on the 3d day of February is of no consequence, so long as the contract then entered into was continued in force and modified, and, as modified, consummated. The two agreements are to be read together, and that of January 20th is to be understood as modified by that of March 20th, which extended the time of performance to April 1, 1902. The plaintiff's assignor merely agreed to waive his commission if the contract between the parties was not carried out, and the fact that the contract was subsequently modified by mutual agreement, without consultation with or further agreement on the part of Thomas F. Cody, could not operate to take

from him the right to commissions which had been fully earned when the parties originally contracted in January.

The defendants urge, however, the provisions of section 640d of the Penal Code, which provides that in cities of the first and second class "any person who shall offer for sale any real property without the written authority of the owner of such property, or of his attorney in fact, appointed in writing," etc., shall be guilty of a misdemeanor, as a bar to the plaintiff's right of recovery. It is conceded that William Dempsey was the attorney in fact of Mary E. Dempsey, the owner of the "Marie," and a paper was offered and received in evidence which reads as follows: "They will take 86 st subject to 1st and 2nd mortgages. We to take 26th ward lots subject to taxes and assessments not to exceed $6,500.00. William Dempsey." Plaintiff's assignor testifies that this paper was made and executed by William Dempsey for the purpose of convincing Frederick Beltz, attorney for Miss Willmann, that he was authorized to enter into the negotiation; and, while it is not as definite as might be desired, we are of opinion that, under the circumstances of this case, the paper might be accepted as a substantial compliance with the provisions of the statute. All that the statute requires is a written authority by the attorney in fact, and, if this paper was given to the plaintiff's assignor for the purpose of showing it to Mr. Beltz, it was an authority to act in the matter. Mr. Dempsey denies that he signed the paper, but there is a decided suggestion of quibbling upon this point, and Thomas F. Cody testifies positively that the paper was signed by Mr. Dempsey in his presence, and where there is a conflict of evidence the court may not say, as a matter of law, that the paper was not delivered to plaintiff's assignor as an authority for acting in the premises. The provision of the statute is highly penal, and it is to be strictly construed (Gay v. Seibold, 97 N. Y. 472, 49 Am. Rep. 533), and there is no definite requirement except that the authority to act in the matter shall be evidenced by a writing. Assuming that it would have been a misdemeanor for the plaintiff's assignor to have acted in the matter without a written authority, and that under such circumstances the courts were denied the right to aid in the collection of this claim, we are of opinion that a question of fact was presented by the evidence which should have been submitted to the jury, and that fact was whether Mr. Dempsey executed this paper and delivered it to Thomas F. Cody with the intention of authorizing him to negotiate this transfer. If such was the purpose, we are of opinion that the writing was sufficient to constitute authority from the defendant's attorney in fact to enter into the negotiation, and that the statute was so far complied with that the plaintiff's assignor could not have been properly convicted of a misdemeanor.

But we are persuaded that, assuming the statute to be valid, it cannot have the effect of preventing a recovery in a case of this character. It is true that, where the statute prohibits the doing of a particular thing, the courts will not aid in enforcing contracts made in violation of the law; but where a contract, not unlawful in itself, has been executed, and the parties have enjoyed the benefits of the contract, the mere fact that one of the parties has violated a penal statute in the approach to the contract will not prevent a court from enforcing pay-

ment.   A vested right of action is property in the same sense in which tangible things are property, and it is equally protected against arbitrary interference.   Where it springs from contract, or from the principles of the common law, it is not competent for the Legislature to take it away.   Every man is entitled to a certain remedy in the law for all wrongs against his person or his property, and cannot be compelled to buy justice, or to submit to conditions not imposed upon his fellows as a means of obtaining it.   Nor can a party by his misconduct so forfeit a right that it may be taken from him without judicial proceedings in which the forfeiture shall be declared in due form.   Forfeitures of rights and property cannot be adjudged by legislative act, and confiscations without a judicial hearing after due notice would be void as not being due process of law.   Cooley's Constitutional Limitations (6th Ed.) 443, 444.   The provision of the Penal Code does not attempt to make it unlawful to enter into a contract of brokerage.   It does not attempt to make such a contract unlawful.   It simply provides that if any person shall offer to sell real estate in cities of the first and second class without having written authority to do so, this act shall constitute a misdemeanor, but this cannot justify outlawing the man who has acted in the premises, and who has, under generally recognized principles of law, earned a commission for his services in bringing the parties together in a contract for the sale or exchange of premises.   In considering a somewhat analogous case under the provisions of section 363 of the Penal Code, which makes it a misdemeanor for a person who transacts business to use the designation "& Company" or "& Co." when no actual partner or partners are represented thereby, the court (in Sinnott v. German-American Bank, 164 N. Y. 386, 391, 58 N. E. 286, 287) say:

"If we might assume that the violation by Feiock of the statute disabled him from enforcing the performance of any executory contract, that was not this case.   This was an executed agreement, and it is inconceivable that in such a case the statute should have any operation.   It is a highly penal one, and deserves a strict construction.   Gay v. Seibold, 97 N. Y. 472, 49 Am. Rep. 533.   It was a measure intended to be in the interests of the commercial community, and had its foundation in public policy.   It simply made it a misdemeanor to do what was therein specified, and that is all.   To extend its operation as far as the plaintiffs would have it would be to give a construction to it which would permit of its injurious operation upon persons whose dealings with the guilty party have been in good faith.   Such a construction would be foreign to the purpose of the enactment, contrary to public policy, and without support in legal principles."

So, in the case at bar, if the alleged misdemeanor on the part of Thomas F. Cody operated to outlaw the claim for services, the plaintiff in this action, who has taken an assignment of a claim under an executed contract, may be deprived of his rights, and thus injuriously affected, while dealing in absolute good faith with the guilty party. It cannot be the policy of the law to place upon third parties the duty of investigating to determine whether their assignors have been guilty of committing misdemeanors in performing executed contracts for services.   They are justified in presuming what the law presumes— that men have not committed crimes in executing contracts not in themselves unlawful; and an executed contract, where the contract itself is not contrary to law, may be enforced, either by an assignor

or by the principal, and the latter is liable only for the penalty of his offense against the penal laws, if at all. It is to be noted in passing that the provisions of section 363 of the Penal Code relate to a positive misrepresentation on the part of the person using the designation "& Company" when there is no one occupying that relation, which in many instances might operate as a positive fraud, by inducing a belief that there were other and responsible members of the firm, and the rule is of universal application; while in the statute now before us (section 640d, Pen. Code) a method of contracting which is permitted by the statute of frauds with respect to every other contract of employment which is to be performed within one year is made a misdemeanor, not generally throughout the state, but in cities of the first and second class only. By its provisions, if a wife who owns real estate suggests to her husband that she would like to sell a piece of property, and the husband goes down street, and offers the same to one of his friends, he is guilty of a misdemeanor if he resides and makes the offer within the limits of certain cities; and those who desire to escape the payment of their honest debts urge a violation of this highly penal statute, which attempts to interfere with the unalienable right of contracting (Grossman v. Caminez, 79 App. Div. 15, 17, 79 N. Y. Supp. 900, and authorities there cited), as a defense to an action based upon an executed contract of which they have enjoyed the fruits.

The discussion of this question might properly end here, but the fact that the Appellate Division of this court in the First Department has felt called upon to go beyond the necessities of the case in Whiteley v. Terry (Sup.) 82 N. Y. Supp. 89, to controvert the decision of this division in Grossman v. Caminez, 79 App. Div. 15, 79 N. Y. Supp. 900, may justify us in saying that we are not convinced of any error in the reasoning of that case, in so far as it dealt with the constitutionality of the provision of the Penal Code, though it might properly have been held, as in the case at bar, that, the contract having been executed, a violation of the penal statute did not constitute a bar to recovery. The learned First Department, conceding that the order before it "must be affirmed, without regard to the question of the constitutionality of the act of 1901," proceeds to review the discussion of this court, and says:

"The learned court says that it has been unable to find any case which holds that the Legislature can make an act innocent and harmless in itself—a necessary or commonly used instrumentality of carrying on the ordinary vocations of life—a crime in one portion of the state, and not in another. But that is exactly what was held in the Havnor Case, 149 N. Y. 195, 43 N. E. 541, 31 L. R. A. 689, 52 Am. St. Rep. 707."

We had examined the Havnor Case when we made the statement cited above, and with the aid of the discussion of the learned court we discover no reason for modifying it in any degree. The Havnor Case has been often cited as holding some such doctrine as the learned court suggests, but an analysis of the decision of the case actually decided shows that this question was not disposed of, and the only matter actually decided was that a law which prohibited barbering on Sundays was a proper exercise of the police power. It is true that the learned jurist writing the prevailing opinion (and the case was

decided by four to three of the members of the court) made some suggestions which might be construed as supporting the view of our critic, but the Court of Appeals has itself laid down the proposition that where, "as sometimes happens, broader statements were made by way of argument or otherwise than were essential to the decision of the question presented, they are the dicta of the writer of the opinion and not the decision of the court. A judicial opinion, like evidence, is only binding so far as it is relevant, and when it wanders from the point at issue it no longer has force as an official utterance." Roberson v. Rochester Folding Box Co., 171 N. Y. 538, 551, 64 N. E. 442, 59 L. R. A. 478, 89 Am. St. Rep. 828, citing authority. This was peculiarly the case in People v. Havnor, 149 N. Y. 195, 43 N. E. 541, 31 L. R. A. 689, 52 Am. St. Rep. 707; where the defendant was convicted of a misdemeanor in carrying on the business of a barber on Sunday afternoon after 1 o'clock, in violation of chapter 823, p. 649, of the Laws of 1895. This act provides that "any person who carries on or engages in the business of shaving, hair cutting or other work of a barber on the first day of the week shall be deemed guilty of a misdemeanor; * * * provided that in the city of New York and the village of Saratoga Springs barber shops * * * may be kept open and the work of a barber performed therein until one o'clock on the afternoon of the first day of the week." The defendant, carrying on the business of a barber in the city of New York, deliberately kept his establishment open after 1 o'clock in the afternoon, at which time the statute made it a misdemeanor throughout the state to engage in barbering, and the only question presented for determination by the court was whether, within the police power, the Legislature was authorized to interfere with the use of the defendant's property, or to limit his liberty of action; and the court held, by a majority of a single vote, that the legislation was within the power of the Legislature. There was no question of the equality of the law. The defendant had violated the act in its general application to every part of the state, and the principal problem presented was whether this statute under which the defendant was convicted was in violation of that provision of the Constitution which provides that "no person shall be deprived of life, liberty or property without due process of law." See opening paragraph of opinion (page 198, 149 N. Y., page 542, 43 N. E., 31 L. R. A. 689, 52 Am. St. Rep. 707). If some barber in the city of Buffalo had been convicted of keeping his shop open before 1 o'clock in the afternoon of Sunday at a time when this might be done under the statute in New York City and the village of Saratoga Springs, the question might have been presented whether he could be deprived of the rights or privileges secured to any citizen of the state, in disregard of the provisions of section 1 of article 1 of the Constitution, and the decision would be controlling here. But that question was not presented in the Havnor Case, nor was it directly discussed, though some of the reasoning in answer to a suggestion raised under the fourteenth amendment would seem to point in the direction of holding that this inequality might exist. But the decision in the Havnor Case was predicated upon the proposition that it was "adapted to promote the public health, and thereby to serve a public purpose of the utmost im-

portance by promoting the observance of Sunday as a day of rest" (page 204, 149 N. Y., page 544, 43 N. E.,.31 L. R. A. 689, 52 Am. St. Rep. 707), and it must be understood in reference to the facts of that particular case, which did not involve in any sense the question of the lawfulness of the exception clauses, for the violation was of the act as it applied generally to every part of the state. When some barber in some locality outside of New York City or Saratoga Springs shall pursue his vocation during the forenoon of Sunday, and shall be duly convicted of the offense designated by the statute, the courts may be called upon to determine the question whether he can be deprived of the rights or privileges secured to citizens in another part of the state, where no elements of a police law are involved. Section 1 of article 1 of the state Constitution provides: "No member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers." While it is not to be doubted that the Legislature might make a police regulation differing in the city of New York from that of a lesser community, it would tax the ingenuity of the courts to justify the legislation involved in the Havnor Case as a police regulation, and at the same time to hold that there was any reason why the privilege of operating a barber shop should be granted to persons in Saratoga Springs and denied to those residing in the village of Salamanca, or any other locality in the state. If it is necessary to the health of barbers (and this was the ground of the decision [page 204, 149 N. Y., page 544, 43 N. E., 31 L. R. A. 689, 52 Am. St. Rep. 707]) to have Sundays set apart for their recreation, there can certainly be no reason why this is not as necessary in the city of New York or Saratoga Springs as it is in every other part of the state, and the special grant of a privilege to members of this state in these two localities, while denying it to others, can have no legitimate relation to the police power, and can have no justification under the letter or spirit of the clause of the Constitution quoted. That is, no considerations of public health, morals, or safety are involved in permitting barbers to pursue their vocations in New York and Saratoga Springs during the early hours of Sunday. It is unlawful in the state generally, because it has been held that considerations of health demand that barbers should be prevented from working at their trade on Sunday; and it has been expressly held that the courts must be able to see, upon a perusal of the enactment, that there is some fair, just, and reasonable connection between it and the common good, and that, unless some such relation exists, the statute cannot be upheld as an exercise of the police power. People v. Havnor, 149 N. Y. 195, 200, 43 N. E. 541, 31 L. R. A. 689, 52 Am. St. Rep. 707, and authorities there cited. If this privilege cannot be justified as an exercise of police power in the localities where it is permitted, then members of this state in Buffalo and every other community are deprived of a privilege secured to other citizens of the state under the provisions of an act which finds its justification in the police power, and to this extent it is unconstitutional and void, under the logical and necessary holding in the Havnor Case. At least, there is room for the courts to hold this view, while acquiescing in the decision in the Havnor Case, which did not hold

that an act innocent and harmless in itself—a necessary or commonly used instrumentality of carrying on the ordinary vocations of life—was a crime in one portion of the state and not in another. It held that a law forbidding barbers to work at their trade on Sunday was justified by the police power, and did not invade the constitutional right to life, liberty, or property. It was not called upon to decide anything farther, and it did not attempt to determine a question not before it. It held that the work of the barber was such that the Legislature might properly determine that it was harmful for himself, and, through him, to society generally, to work more than six days per week; and, being harmful to society, that the Legislature might, under the police power, regulate the time of employment, even though it operated to limit his use of property and the exercise of his faculties in a lawful occupation.

This section of the Penal Code (640d) is not an act to regulate brokers in real estate. It relates to any person who shall offer for sale real estate in cities of the first and second classes without having written authority, and makes the most harmless and innocent acts of husband, wife, and children in seeking to promote the sale of real estate for members of their own family criminal. It is not the licensing of a class of business men. It is not the regulation of a business in the interests of the public health or public morals or public safety, but is an attempt to interfere with the right of the citizen to aid his fellow men in bringing about the sale or exchange of real estate in certain localities without any considerations of a public character to justify it. No one can have his real estate sold without his active concurrence. The owner of real estate is perfectly safe in the enjoyment of his property until he executes the papers necessary to transfer the title, and because some individuals may have been annoyed by claims of brokers—as the defendants in the case at bar are annoyed, perhaps—is no reason why the rights of citizens should be invaded by criminal statutes applying only to limited portions of the state. No reason is suggested—no good reason, we believe, can be suggested—why it is more of a crime to offer to sell real estate in cities of the first and second class without a written authority than in cities of the third class, or in any part of the state. Human nature is much the same in all parts of the state, and, if there is a reason for abridging the rights or privileges of citizens of one portion of the state in respect to the contracts they may make, there would seem to be no reason why this should not be applied to all citizens, and this would make the law so obnoxious that it would be repealed. This was the very purpose which the Constitution was intended to conserve; it was intended to compel the Legislature, outside of the exercise of the police power, which permits of special provisions for special reasons, to enact legislation of universal application, so that the rights of all would be given the protection of public sentiment, which would not be the case if the law operated oppressively only upon a limited number, or in isolated communities. "Every one," says that great exponent of constitutional law, Judge Cooley, "has a right to demand that he be governed by general rules; and a special statute, which, without his consent, singles his case out as one to be regulated by a different law

from that which is applied in all similar cases, would not be legitimate legislation, but would be such an arbitrary mandate as is not within the province of free governments. Those who make the laws 'are to govern by promulgated, established laws, not to be varied in particular cases, but to have one rule for rich and poor, for the favorite at court and the countryman at plow.' This is a maxim in constitutional law, and by it we may test the authority and binding force of legislative enactments." Cooley's Constitutional Limitations (5th Ed.) 484, 486, cited with approval in Cotting v. Kansas City Stock Yards Co., 183 U. S. 79, 109, 22 Sup. Ct. 30, 46 L. Ed. 92. One of the strongest arguments against the assumption of the British Parliament of the power to legislate for the colonists in "all cases whatsoever" was the fact that those who legislated were not called upon to live under the laws which they had made, as was the case in England, and we have persistently sought to keep our legislation within these limitations. In the Cotting Case, cited above, the court had under consideration a statute which required the payment of the wages of laborers in money, but it was provided that it should apply only in the case of corporations or trusts employing 10 or more persons. The Kansas courts held this act unconstitutional, and it went to the United States Supreme Court, where (at page 109, 183 U. S., page 42, 22 Sup. Ct., 46 L. Ed. 92) the court say:

"So we have the clear declaration of the Supreme Court of Kansas that legislation by which one individual, or even one set of individuals, is selected from others doing the same business in the same way, and subjected to regulations not cast upon them, is a discrimination forbidden by the constitutional provision which obtains both in the Constitution of Kansas and in that of the United States to the effect that the equal protection of the laws is guarantied to all."

Continuing, the court say:

"May we not rightfully accept this declaration of law by the highest tribunal of the state by whose Legislature the act in question was passed, and, accepting the reasoning of that decision, does it not follow that, if an act which provides certain regulations for corporations employing ten or more laborers, and leaving corporations employing less than that number free from such regulations, is an unjust discrimination, and a denial of the equal protection of the laws—an act which imposes regulations upon corporations doing business over a certain amount and leaving all corporations doing a like business less than that amount free from such regulations is equally obnoxious to constitutional prohibition?"

In the same case (page 111, 183 U. S., page 43, 22 Sup. Ct., 46 L. Ed. 92) it is said:

"But, while recognizing to the full extent the impossibility of an imposition of duties and obligations mathematically equal upon all, and also recognizing the right of classification of industries and occupations, we must nevertheless always remember that the equal protection of the laws is guarantied, and that such equal protection is denied when upon one of two parties engaged in the same kind of business, and under the same conditions, burdens are passed which are not passed upon the other."

Is there any difference in the conditions of doing business between a man on one side of an imaginary line, who happens to be in the city of New York, and another, who, on the other side of the same imaginary line, is within the limits of Mt. Vernon? Yet one of these

might offer the real estate of a third person for sale without written authority without committing any possible offense against the laws; might offer it to the man within the limits of New York, and the other, by making a counter offer, under the same conditions, would be guilty of a crime under the statute. Is it possible, under a Constitution which forbids that any member of the state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, that this can be the law? Is it within reason that an act, innocent and innocuous in all places, involving no more possibilities of abuse than are to be found in every contractual relation of life, should be a crime on one side of the boundary line between New York and Mt. Vernon and an innocent act on the other; that the mere taking of a step within the same legislative jurisdiction could make that a crime which otherwise was without vice of any character? The power of the Legislature to declare what shall constitute a crime is exceedingly large, and it is difficult to define its exact limit. But that there is a limit even to that power under our Constitution we entertain no doubt, and we think the limit has been reached and passed in the act under review. People v. Gillson, 109 N. Y. 389, 403, 17 N. E. 343, 4 Am. St. Rep. 465.

The judgment appealed from should be reversed, and a new trial granted, with costs. All concur.

---

(86 App. Div. 323.)

## TOWNSEND et al. v. GREENWICH INS. CO. OF THE CITY OF NEW YORK et al.

(Supreme Court, Appellate Division, Second Department. July 24, 1903.)

1. INSURANCE—LOSS—APPRAISERS—ACTION ON POLICY—EVIDENCE.

Where in an action on a policy, after disagreement as to the amount of the loss, the parties entered into a written agreement as provided by the policy, appointing appraisers to determine the amount of the loss without restriction, and such appraisers fixed the loss at $4,156.58, parol evidence, in the absence of fraud or mistake, was inadmissible, in a subsequent action to recover the face of the policy, to show a prior agreement for the appointment of such appraisers, limiting their authority to fix the loss at a sum not less than $6,000.

2. SAME—DIRECTION OF VERDICT—EXCLUSION OF EVIDENCE.

Where in an action on a policy parol evidence varying a written contract for the appointment of appraisers was erroneously admitted, the court, on a motion to direct a verdict, was entitled to disregard the same.

3. SAME.

Appraisers appointed by parties to a standard fire policy to fix the amount of a loss are not arbitrators, and hence the fact that plaintiffs were not notified of the meetings of the appraisers did not affect the validity of their findings.

4. SAME—ACTION ON POLICY—TENDER OF AMOUNT PAID.

Where insurer paid its proportion of the amount of a loss fixed by appraisement to a mortgagee of the property, as authorized by the policy, insured was not entitled to sue on the policy without offering in the pleadings to return to insurer the amount so paid, and tender the same on the trial.

Appeal from Trial Term, Nassau County.