## HARTUNG *v.* THE PEOPLE.

The act in relation to capital punishment (ch. 410 of 1860), in so far as it attempts to subject to the new punishment, of death and previous imprisonment at hard labor, persons already under conviction for murder, is *ex post facto* and void.

*It seems* that any law changing the punishment for offences committed before its passage is *ex post facto*, and void under the Constitution, unless the change consists in the remission of some separable part of the punishment, before prescribed, or is referable to prison discipline or penal administration as its primary object.

*It seems*, though all the provisions for inflicting death as the punishment of murder are repealed by the act of 1860, that it is the intention of the act to retain such punishment.

Hartung *v.* The People.

In what manner death is to be inflicted and whether the mode is in the discretion of the court, the sheriff or the Governor, *Quere.*

The repeal of a law imposing a penalty, though it takes place after conviction, arrests the judgment; and when the repeal is after judgment, the judgment is to be reversed upon writ of error.

Upon appeal under the Code, however, *it seems,* that the judgment of the subordinate tribunal is not to be reversed unless it was erroneous, when pronounced, upon the law as it then stood. *Per* Denio, J.

Writ of error to the Supreme Court. Mary Hartung, the plaintiff in error, was indicted and convicted in the Albany Oyer and Terminer, for the murder of her husband by poisoning. He died on the 21st of April, 1858. Sentence having been pronounced, the record of the Oyer and Terminer, together with a bill of exceptions taken by the prisoner, were brought by writ of error to the Supreme Court, and the judgment against her having been affirmed, at general term in the third district, a writ of error from this court was allowed.

The exceptions taken upon the trial were here all determined against the prisoner. They are not of sufficient interest to require a report of that portion of the opinion of the court relating to them.

The final judgment in the Supreme Court against the plaintiff in error, was rendered on the 9th day of January, 1860. The day appointed for her execution had passed, and before a new day had been appointed, the case was brought to this court. After the return to the writ of error, which was made February 14, 1860, and previous to the argument, viz.: on the 14th of April, 1860, an act passed the legislature (ch. 410 of 1860), "in relation to capital punishment." The determination of the case turned upon the operation of that act. The judgment was reversed, and the court not being able judicially to see that upon a new trial the prisoner might not be convicted of manslaughter, in some inferior degree, a new trial was ordered.

*William J. Hadley,* for the plaintiff in error.

*Samuel G. Courtney,* for the People, defendants in error.

*By the Court*—DENIO, J.:

\* \* But a question of great importance arises under the act of April last, in relation to capital punishments. (Ch. 410 of the Laws of 1860.) By the terms of that statute, all those portions of the existing statutes which provided for the punishment of death on convictions for crime were repealed, without any saving in respect to offences already committed. This repeal was effected by amending the first section of the first chapter of the fourth part of the Revised Statutes, which declared that all persons who should be convicted of treason, murder or arson in the first degree should suffer death, so that it should read that those convicted of such crimes should be punished as therein provided; and then there was no subsequent provision left for inflicting the punishment of death in any case. Twelve sections of the same title are repealed by their numbers. One of these—section 25—is that which prescribes the manner of death in capital executions, namely, by hanging. The other repealed sections contain regulations respecting executions in certain cases, which would be inapplicable to the mode of punishment referred to in the new act. There are no provisions directed to be inserted as new sections, nor any other amendments of existing sections of the Revised Statutes. As thus changed by the law of 1860, the Revised Statutes would not provide for the punishment of death in any case, though certain details respecting executions which remain unrepealed would show that such a punishment was considered as existing. The new statute sets out with a declaration that no crime thereafter committed, except treason, and murder in the first degree, shall be punished with death in the State of New York. (§ 1.) The remaining parts of the act define the crime of murder anew, dividing it into first and second degrees. It is clearly inferable from the 1st section, and also from the 4th and 5th sections, that capital punishment was intended to be retained, under certain modifications, as the punishment for murder in the first degree, though it is not so enacted in terms. These sections are as follows:

" § 4. When any person shall be convicted of *any crime punishable with death*, and sentenced to suffer such punishment,

he shall, at the same time, be sentenced to confinement at hard labor in the state prison until such punishment of death shall be inflicted. The presiding judge of the court at which such conviction shall have taken place shall immediately thereupon transmit to the Governor of the State, by mail, a statement of such conviction and sentence, with the notes of testimony taken by such judge on the trial.

" § 5. No person so sentenced or imprisoned shall be executed in pursuance of such sentence within one year from the day on which such sentence of death shall be passed, nor until the whole record of the proceedings shall be certified by the clerk of the court in which the conviction was had, under the seal thereof, to the Governor of the State, nor until a warrant shall be issued by the Governor, under the great seal of the State, directed to the sheriff of the county in which the state prison may be situated, commanding the said sentence of death to be carried into execution."

In a subsequent section it is provided that the provisions of the act for the punishment of murder in the first degree shall apply to the crime of treason. (§ 9.)   But there are no provisions in the.act specially providing for the punishment of murder in the first degree, nor any which do not, in terms, equally apply to the crime of treason. I cannot attach any intelligible meaning to these several provisions except by assuming that the person who drew the bill supposed that in the 1st or the 4th and 5th sections he had declared murder in the first degree punishable with death. But there was not, in either of these sections, or elsewhere in the act, any separate provision for the punishment of that crime, or which declared that any crime should be punished with death. It is true that, in the declaration of the 1st section, that no crime except treason and the first degree of murder should be punished with death, there is an implication, in the nature of a negative pregnant, that those crimes shall be so punished. So, in the 4th section, where it is said that, upon a conviction for a crime punishable with death and a sentence to such punishment, there shall be added a sentence to imprisonment, it is clearly enough implied that

there are crimes punished capitally. So, likewise, when the 5th section declares that no person so sentenced shall be executed within one year from the sentence, nor until the Governor shall have issued his warrant, there is, of course, a very strong implication that he may be so executed after the expiration of the year if such a warrant shall be issued. It is very unusual to leave the meaning of the legislature upon a subject so important to be deduced by implication. Still, the intention to preserve the punishment of death, when the Governor shall approve of the sentence, in addition to imprisonment for one year, is so manifest, that, in the further discussion of this case, I shall assume that such is the effect of the statute.

It is necessary now to notice a further provision in the act especially applicable to the case of this convict, which is in the following words: " All persons now under sentence of death in this State, or convicted of murder and awaiting sentence, shall be punished as if convicted of murder in the first degree under this act." (§ 10.)

Several interesting questions arise as to the application of this statute to the case before us: first, whether the prisoner can be executed under the provisions of the Revised Statutes which were in force when the crime was committed and when the trial and conviction took place, but which have since been repealed; second, if not, whether she can be punished with death, with the addition of a preliminary imprisonment as provided in the 4th section of the act of 1860; and, finally, whether we can give effect to our conclusions, if they are favorable to the prisoner, upon this writ of error, in which we sit in review of a judgment which was not erroneous at the time it was pronounced.

1. Sir MATTHEW HALE lays it down, in his history of the Pleas of the Crown, that when an offence is made treason or felony by an act of Parliament, and then the act is repealed, the offences committed before such repeal, and the proceedings thereupon, are discharged by such repeal, and cannot be proceeded on after such repeal, unless a special clause in the act

of repeal be made, enabling such proceedings, after the repeal, for offences committed before the repeal. (Vol. I, p. 291.) This statement is made in the course of a commentary on the statute of Edward IV, respecting treasons. It abolished all treasons declared by act of Parliament since the 25th Edward III; but it contained a clause providing that no person already arrested or imprisoned, indicted or convicted of treason, should have any advantage of the act. This clause the learned writer considered necessary to prevent all such proceedings from falling to the ground, and then he lays down the rule as above stated. For the same reason, when, upon the enactment of the Revised Statutes of this State, nearly all the then existing statutory law was repealed, it was considered necessary to provide that no offence committed, and no penalty or forfeiture incurred previous to the time when the general repeal should take effect, should be affected by such repeal, and also that no prosecution for any offence then pending should be affected by it. (2 R. S., 779, §§ 6, 7.)

The law, as stated by HALE, has been steadily adhered to in England and in this country. It was stated and applied in *Miller's case* (1 Wm. Bl., 451), and in *Rex* v. *McKenzie* (Russ. & Ry., 429). In the last case, the prisoners were indicted of stealing privately from a shop goods of the value of five shillings. A statute of William III had made this felony, without benefit of clergy; but this act was repealed by an act of 1 George IV, which took effect after the offence of the prisoners was committed. The repealing act also provided for the punishment of such an offence thereafter committed, by transportation for life. The court held, on the authority of the passage in HALE, that a conviction could not be had under the repealed statute; and it clearly could not, under the provision in the last act, which was only prospective in its operation.

In *The Queen* v. *The Inhabitants of Mawgan* (8 Adolph. & Ellis, 496), and *The Same* v. *The Inhabitants of Denton* (14 Eng. L. & Eq., 124), the rule was applied to prosecutions for penalties. In the last case, Lord CAMPBELL stated the

general rule to be, that a repealed statute cannot be acted on after it is repealed; but that, as to all matters that have taken place under it before its repeal, they remain valid and cannot be questioned. COLERIDGE, J., in the same case, quoted with approbation the declaration of Lord TENTERDEN, in *Surtees* v. *Ellison* (9 Barn. & Cress., 750), that it had long been established that when an act of Parliament is repealed, it must be considered as if it had never existed. In *United States* v. *Passmore* (4 Dall., 372), Judge WASHINGTON, in the Circuit Court of the United States, directed an acquittal of the defendant, who was indicted for perjury in an oath taken in proceedings in bankruptcy while that act was in force, because it had been afterwards repealed, with a saving only in favor of continuing proceedings upon commissions of bankruptcy then pending. (See the same case, reported as anonymous, in 1 Wash. Cir. Ct. R., 84.) In *The Commonwealth* v. *Duane*, in the Supreme Court of Pennsylvania, the defendant had been indicted and convicted for a libel at common law on the Governor of the State. After conviction, the legislature passed an act declaring that no person should be subject to prosecution by indictment for any publication as to the official conduct of officers or men in a public capacity. It was held that no judgment could be pronounced, and the defendant was discharged. (1 Binney, 601.) The same doctrine has been held in the Supreme Court of the United States. (*Yeaton* v. *United States*, 5 Cranch, 281; and *The schooner Rachel* v. *The United States*, 6 id., 329.) In each of these cases, judgment of forfeiture upon proceedings in admiralty had been pronounced in the court of original jurisdiction before the repeal of the statutes which gave the forfeiture, and both judgments were reversed, on account of such repeal, by the Supreme Court. In the first case, Chief Justice MARSHALL said: "After the expiration or repeal of a law, no penalty can be enforced, nor punishment inflicted, for violations of the law committed while it was in force, unless some special provision be made for that purpose by statute." In later cases, some stress was laid upon the effect of an appeal in admiralty cases, which, it was said, opened the case upon

the facts as well as the law. In the last case, the condemned vessel had been sold and the proceeds paid over to the United States, pursuant to the sentence of the Circuit Court, and an order of restitution was made by the Supreme Court.

The Supreme Court of Massachusetts has repeatedly affirmed the same doctrine. In *The Commonwealth* v. *Marshall*, the defendant was indicted under the statute against disinterring dead bodies, passed in 1814. This statute was repealed upon a revision of the laws, in the year 1830. The act charged seems to have been an offence at common law before either of the statutes was passed. The offence was committed during the existence of the first mentioned act. The defendant confessed the indictment, and the question was, what judgment should be rendered. The opinion of the court was given by Chief Justice SHAW, to the following effect: "The act cannot be punished as an offence at common law, for that was not in force during the existence of the statute; nor by the statute of 1814, because it has been repealed without any saving clause; nor by the statute of 1830, for the act was done before that statute was passed. No judgment can, therefore, be rendered against the defendant on this indictment." (11 Pick., 350.) In 21st Pickering, 373 (*The Commonwealth* v. *Kimball*), a similar decision was made. The defendant had been convicted of an offence under the statute against selling spirituous liquor. After the conviction, a change in the statute took place, which the court held impliedly repealed the one which was in force when the act was done. It was held that judgment could not be given against the defendant, but that it must be arrested. The general question as to the effect of the repeal of a statute has been examined, in this State, by the late Judge COWEN, in *Butler* v. *Palmer* (1 Hill, 324). The case did not involve the decision of the precise point now before us, though it occurred to the judge to consider it, for the purpose of his argument as to the case under consideration. He said: "The repeal of a law imposing a penalty, though it takes place after conviction, arrests the judgment." He also refers, assentingly, to the statement of TINDAL, Ch. J., in *Key* v. *Gordon* (4 Moore & Payne,

Hartung *v.* The People.

341–350), that the repeal of a statute obliterates it as completely from the records of Parliament as though it had never been passed.

But it scarcely required an examination of authorities to establish a principle so plain upon reason as that life cannot be taken under color of law, after the only law by which it was authorized to be taken has been abrogated by the law-making power. But, if the doctrine was less clearly established by reason and authority, it would be the rule to be applied to this case upon the concession of the statute of 1860 itself. In several of the cases which have been adjudged, and to which reference has been made, the immunity extended to the offender was the result of accident or inadvertence. It was apparent that, if the thought had occurred to the law-makers, a saving clause as to existing offences, and especially as to prosecutions and convictions which had taken place, would have been added. Here, however, it is entirely clear that it was intended by the law-makers that offenders in the situation of the plaintiff in error should not be punished under the law which was repealed; for, by the 10th section, as we have seen, a special provision is made for such cases. Convicts for murder, sentenced under the former law, or awaiting sentence, were declared to be punishable, not under the law prevailing when the offence was committed and when the conviction took place, but, "*as if* convicted of murder under this act."

2. This leads me to the second question to be considered, namely, whether it is competent for the legislature, after the conviction of a person prosecuted for murder, to change the punishment which the law had annexed to the offence, for another and different punishment, as was attempted to be done in this case. It is highly probable that it was the intention of the legislature to extend favor, rather than increased severity, towards this convict and others in her situation; and it is quite likely that, had they been consulted, they would have preferred the application of this law to their cases, rather than that which existed when they committed the offences of which they were convicted. But the case cannot be determined upon such con-

siderations. No one can be criminally punished in this country, except according to a law prescribed for his government by the sovereign authority, before the imputed offence was committed, and which existed as a law at that time. It would be useless to speculate upon the question whether this would be so upon the reason of the thing, and according to the spirit of our legal institutions, because the rule exists in the form of an express written precept, the binding force of which no one disputes. No State shall pass any *ex post facto* law, is the mandate of the Constitution of the United States. The present question is, whether the provision under immediate consideration is such a law, within the meaning of the Constitution. I am of opinion that it is. The scope and apparent intention of the act of 1860 is to reduce the punishment for murder, in certain cases. At present, we have no concern with the new arrangement, for in that respect the act is prospective. But the substituted punishment is made applicable to offences committed under the old law, where convictions have already been had. Persons convicted of murder, as that offence was declared by the Revised Statutes, where the judgment has not been executed, are to be punished as though convicted of murder in the first degree under the act of 1860. To abolish the penalty which the law attached to the crime when it was committed, and to declare it to be punishable in another way, is, as it respects the new punishment, the essence of an *ex post facto* law. (*Fletcher* v. *Peck,* 6 Cranch, 87–138.) In this case, Chief Justice MARSHALL defined an *ex post facto* law to be, one which rendered an act punishable " in a manner in which it was not punishable when it was committed." Chancellor KENT has expressed his approval of that definition, which, he says, is distinguished for its comprehensive brevity and precision. (4 Kent., 409.) Judge CHASE, in *Calder* v. *Bell* (3 Dall., 386), stated his apprehension of what was meant in the Constitution by the term in question as follows: He said such laws were, "first, any law which makes an act done before the passing of the law, and which was innocent when done, criminal; second, any law which aggravates a crime, and makes it greater than it was

Hartung *v.* The People.

when committed; third, any law which changes the punishment, and inflicts a greater punishment than the law annexed to the crime when committed; fourth, any law which alters the legal rules of evidence." Neither of the cases in which these remarks were made, involved any question as to the kind or degree of change in the punishment of an offence already committed, which might be made without a violation of the Constitution. A rule upon that subject is now to be laid down for the first time. In my opinion, then, it would be perfectly competent for the legislature, by a general law, to remit any separable portion of the prescribed punishment. For instance, if the punishment were fine and imprisonment, a law which should dispense with either the fine or the imprisonment might, I think, be lawfully applied to existing offences; and so, in my opinion, the term of imprisonment might be reduced, or the number of stripes diminished in cases punishable in that manner. Anything which, if applied to an individual sentence, would fairly fall within the idea of a remission of a part of the sentence, would not be liable to objection. And any change which should be referable to prison discipline, or penal administration, as its primary object, might also be made to take effect upon past as well as future offences, as changes in the manner or kind of employment of convicts sentenced to hard labor, the system of supervision, the means of restraint, or the like. Changes of this sort might operate to increase or mitigate the severity of the punishment of the convict, but would not raise any question under the constitutional provision we are considering. The change wrought by the act of 1860, in the punishment of existing offences of murder, does not fall within either of these exceptions. If it is to be construed to vest in the Governor a discretion to determine whether the convict should be executed, or remain a perpetual prisoner at hard labor, this would only be equivalent to what he might do under the authority to commute a sentence. But he can, under the Constitution, only do this once for all. If he refuses the pardon, the convict is executed according to sentence. If he grants it, his jurisdiction of the case ends. The act in question places

the convict at the mercy of the Governor in office at the expiration of one year from the time of the conviction, and of all his successors during the lifetime of the convict. He may be ordered to execution at any time, upon any notice or without notice. Under one of the repealed sections of the Revised Statutes, it was required that a period should intervene between the sentence and the execution of not less than four, nor more than eight weeks. (§ 12.) If we stop here, the change effected by the statute is between an execution within a limited time to be prescribed by the court, or a pardon or commutation of the sentence during that period, on the one hand, and the placing of the convict at the mercy of the executive magistrate for the time, and his successors, to be executed at his pleasure at any time after one year, on the other. The sword is indefinitely suspended over his head, ready to fall at any time. It is not enough to say, if even that can be said, that most persons would probably prefer such a fate to the former capital sentence. It is enough to bring the law within the condemnation of the Constitution, that it changes the punishment, after the commission of the offence, by substituting for the prescribed penalty a different one. We have no means of saying whether one or the other would be the most severe in a given case. That would depend upon the disposition and temperament of the convict. The legislature cannot thus experiment upon the criminal law.

The law, moreover, prescribes one year's imprisonment, at hard labor, in a state prison, in addition to the punishment of death. In every case of the execution of a capital sentence, it must be preceded by the year's imprisonment at hard labor. True, the concluding part of the judgment cannot be executed unless the Governor concurs, by ordering the execution. But as both parts may, in any given case, be inflicted, and as the convict is consequently, under this law, exposed to the double infliction, it is, within both the definitions which have been mentioned, an *ex post facto* law. It changes the punishment, and inflicts a greater punishment than that which the law annexed to the crime when committed. It is enough, in my

opinion, that it changes it in any manner except by dispensing with divisible portions of it; but, upon the other definition anounced by Judge CHASE, where it is implied that the change must· be ·from a less to a greater punishment, this act cannot be sustained.

The mode of execution, according to the Revised Statutes, was by hanging (§ 25); but that section is repealed. How, then, is the convict to be executed? This law does not prescribe the manner. The common law cannot be resorted to, for that system, as applied to this subject, was not in existence when this offence was committed, having been superseded by the Revised Statutes. The mode must, therefore, rest in the discretion of the Governor or the sheriff, and, for aught I see, the method prevailing in France, or Russia, or Constantinople, or that which the English law formerly applied to convictions for heresy or petit treason, may be adopted.

The punishment of murder at the common law, was by hanging the offender by the neck until he should be dead. The statutory provision declaring that the punishment of death should be thus inflicted, was consequently in affirmance of the prescription of the common law. When the legislature of 1860 repealed that section of the statute without substituting anything as to the execution of a capital sentence in its place, they necessarily determined that it should no longer be obligatory for the court by its judgment, or the executive officers in the performance of their duties, to resort to that method of inflicting the punishment of death. It is not clear, whether under the late act the manner of the execution should be determined by the Court, the Governor, or the sheriff. The only thing relating to the subject which is certain, is, that the execution is no longer required to be by hanging. The provision in the 5th section of the 1st article, forbidding cruel and unusual punishments, would no doubt apply to the case; but then the duty of determining whether any given method of inflicting death would be within the prohibitions, would be thrown upon the court or the executive magistrate. It is this system, thus uncertain in its results in particular cases, and always depend-

ing upon official discretion, that the legislature has substituted for the definite and certain mode of executing the sentence which was prescribed by the law which existed when the offence of this convict was committed. With the expediency of the change considered as a rule to be applied to future cases, we have nothing to do, but we feel bound to say that in its application to offences which had been committed before the act was passed, it was a violation of the constitutional provision under consideration.

We are therefore of opinion, that the 10th section of the law in question as applied to the present case, is an *ex post facto* law, and that it is unconstitutional and void.

We have come to the conclusion, lastly, that we are bound to make these results the basis of our judgment upon this writ of error. Generally the question in a court of review is, whether the judgment of the subordinate tribunal was erroneous when pronounced upon the law as it then stood. This is so I think upon appeals arising under the Code where the jurisdiction conferred is " to review on appeal every *actual* determination " of the subordinate courts. On this writ we proceed under the common law, and the judiciary act of 1847, where the power is " to correct and redress all errors that may happen " in the Supreme Court, &c. ; and all laws relating to the late Court of Errors are made applicable to this court. (Laws of 1847, p. 321, § 8.) The question upon writs of error at the common law is, whether there is error *in the record*. This is ascertained by applying the law to the judgment contained in the record, and ascertaining whether the latter is supported by the former. If we do this in the present case, in connection with the doctrine laid down by Lord TENTERDEN in *Surtees* v. *Ellison*, and approved of in *Reg.* v. *The Inhabitants of Denton*, that when a statute is repealed it must be considered as if it had never been enacted, we cannot fail to see that the judgment is erroneous. We may admit that the court did not err in pronouncing the judgment, at the same time that we determine that it ought not now to stand, or to be executed. I think it clear, that a judgment ought not to be affirmed on error, where it must have

Hartung *v.* The People.

been arrested on the record in the court of original jurisdiction if a motion for that purpose had been made. In each of the cases of *Reg.* v. *The Inhabitants of Denton, The Same* v. *The Inhabitants of Mawgan, The Commonwealth* v. *Marshall, The Same* v. *Kimball,* and *The Same* v. *Duane,* before mentioned, the judgments were arrested because the laws which gave the penalties or created the offence had been repealed. In the last of these cases the repealing statute was passed after the trial and conviction. It is therefore a precise precedent for the judgment we propose to give in this case, if the errors in the record which would cause a judgment to be arrested would lead to its reversal on error; and we think the law applicable to each of these proceedings is the same. In the two cases referred to, from the 5th and 6th of Cranch's Reports, the sentences of the Circuit Court, were reversed on appeal by the Supreme Court of the United States, and in one of them restitution was ordered, though it was not questioned but that the judgments were wholly free from error when they were pronounced.

In conclusion, therefore, we determine that the judgment under review is erroneous because there is not at this time any law which authorizes or sustains it, or which would warrant its execution. We have come the more readily to this determination upon the matter of form, because we do not perceive any remedy which the plaintiff in error would have if we should affirm the judgment of the Supreme Court. As that judgment affirmed the sentence passed upon the plaintiff in error in the Oyer and Terminer, that court might feel bound to fix a new day for the execution. The plaintiff in error could not be relieved on *habeas corpus,* for the Revised Statutes declare, that persons committed or detained by virtue of the final judgment of any court of competent civil or criminal jurisdiction, shall not be entitled to that writ. The plaintiff in error would therefore be remediless if the judgment should stand. The judgment of the Supreme Court and that of the Oyer and Terminer must be reversed.

All the other judges concurring,

Judgment reversed and new trial ordered.