Richards W. Hannah, J.
This motion by the petitioner to extend the order of support of the child to 21 years presents a problem which is involved in about 30,000 pending paternity cases, in -which the former Court of Special Sessions had ordered support of children born out of wedlock up to their sixteenth birthday. Until September 1,1962, the New York City Criminal Courts Act, subdivision 2 of section 69, provided for support until the child reaches the age of 16 years with the power to extend it for good cause shown to the age of 21 years or longer in the discretion of the court. The Iuav was amended on September 1, 1962, to provide for such support and education until the child is 21 and subsequently for good cause shown in the discretion of the court (Family Ct. Act, § 545). The Department of Welfare is the petitioner against the father in about 95% of these eases since the child is receiving Avelfare. The mother is the petitioner in the other 5%. Usually the amount of the order does not cover the amount paid by the Department of Welfare or expended by the mother for the child’s or children’s support. However, it does lessen the burden on the Department of Welfare and the mothers by placing it on the fathers where it properly belongs. Presently the Department of Welfare and the mothers are taking advantage of the new statute and petitioning this court to extend these orders to 21 years. The amount of the orders vary from small to large amounts. A great number of people and a large amount of money are involved if the orders of the Court of Special Sessions are extended until the child becomes 21 years of age. The payments under the extended order would continue to reimburse the Department of Welfare and the mother completely in some cases and partially in others. With these introductory remarks, we proceed to the instant problem.
In this proceeding the Court of Special Sessions entered an order on May 25, 1948, ordering the support of the child. The child was born on March 5, 1947, and was 16 years of age on March 5, 1963. The defendant was ordered to pay the sum of $3 weekly “ for and towards the support and education of said child until the said child reaches the age of sixteen years.” The amount of the order was raised to $15 weekly on September 21, 1948, and was reduced to $8 weekly on October 25, 1949. The New York City Criminal Courts Act provided that the Court of Special Sessions had continuing jurisdiction over the order and the power to increase or decrease the amount and for good cause *494 shown, to extend it to age 21 years or longer in the discretion of the court. (N. Y. City Crim. Cts. Act, § 69, subd. 2; § 72).
On September 1, 1962, the Court of Special Sessions was abolished, and all the paternity proceedings transferred to this court (L. 1962, chs. 688, 697). On that date the child was under 16 years of age. On September 1, 1962, the Family Court Act became effective, which provided that a father was liable for support of an infant born out of wedlock until the age of 21 years and for good cause shown a longer time with no limitations (Family Ct. Act, § 545). This court has continuing jurisdiction over the order with power to increase or decrease the amount (Family Ct. Act, § 451).
The respondent opposes this application upon the ground that the proceeding against the father was criminal in nature. (N. Y. City 'Crim. Cts. Act, art. V). He points out that the action is in a criminal court, that the rules of evidence applicable to criminal cases are applied, to wit: the hearsay rule, a plea of guilty subsequently withdrawn would not be admissible and that evidence of the respondent’s good character can be adduced. He also urges that the new section 545 of the Family Court Act, raising the age of support to 21 years, is an ex post facto law. It is his position that since this is a criminal proceeding his rights are fixed by the law in effect at the time of the occurrence.
The nature of paternity proceedings has been described as sui generis.
In Duerr v. Wittmann (5 A D 2d 326, 328-330 [1st Dept., 1958]) the court, in discussing the nature of paternity proceedings, said:
‘ ‘ A civil action is commenced by the service of a summons (Civ. Prac. Act, § 218). A criminal prosecution is commenced by the issuance of a warrant of arrest upon an information, or upon the filing of an indictment (Code Crim. Pro., § 144). * * * Prosecutions are criminal actions brought by the People of the State of New York, as plaintiff, against a party charged with a crime, for the purpose of imposing punishment (Code Crim. Pro., §§ 5, 6). A crime is defined in section 2 of the Penal Law as an act or omission forbidden by law and punishable by death, imprisonment, fine, removal or disqualification from office, or other penal discipline, classifiable either as a felony or as a misdemeanor. Clearly, therefore, while some aspects of a filiation proceeding may be criminal in character, it is not a prosecution for the punishment of a crime.
^
‘ ‘ Other procedural rules peculiar to criminal cases are equally inapplicable to paternity cases. The allegations need not be *495 established beyond a reasonable donbt (Commissioner of Public Welfare v. Ryan, 238 App. Div. 607); corroboration of the mother’s testimony is not required (Commissioner of Public Charities v. Vassie, 167 App. Div. 74); a defense of double jeopardy is unavailable (Hodson v. Hoff, 266 App. Div. 228, affd. 291 N. Y. 518); and a judgment may be rendered in the absence of the defendant (N. Y. City Grim. Cts. Act, § 67, subd. 2) — to name only a few.
“ Nor can the paternity proceeding properly be deemed a civil action governed by the Civil Practice Act and Buies of Civil Practice, which action must be commenced by the service of a summons. While it is in a sense a dispute between private litigants for the enforcement of rights and the prevention of wrongs with regard to obligations of financial support, it is a dispute in which the State has an interest, in which it may participate on behalf of the mother, and in which the machinery of the criminal courts is invoked. In fact, it was not until comparatively recently that private parties as well as governmental bodies were given the right to initiate a paternity proceeding.
“ It was in order to relieve the community’s financial burden and to indemnify it that the statutory paternity proceeding was created, through the enactment of the English Poor Law of 1576 (Stat. 18 Eliz. ch. 3). Only in 1925 was the mother allowed to bring proceedings in her own name and in her own right as a private litigant (L. 1925, ch. 255). But unlike the private litigant in a common-law action, she must bring her suit in a criminal court by presenting her complaint to the court, in much the same way as an information is presented in a criminal proceeding. A warrant of arrest can be issued for the defendant forthwith, evidence of good character is admissible, and confessions and admissions must be corroborated by other proof.
‘ ‘ In short, the filiation proceeding is not readily categorized as either a civil or a criminal action. It is a creature sui generis, to which special rules apply. It may be properly denominated as quasi-criminal, or, as it was under the old code provisions, among ‘ special proceedings of a criminal nature ’ (Code Grim. Pro., tit. V; Commissioners of Public Welfare v. Simon, 270 N. Y. 188).
“ These special proceedings are governed by their own rules, separate and distinct from those generally applicable to civil and criminal actions.”
Similar language supporting this view is found in Hodson v. Hoff (266 App. Div. 228, affd. 291 N. Y. 518) and Hough v. Light (275 App. Div. 299).
*496 The respondent’s claim that this proceeding is criminal in nature must be rejected.
The respondent also urges that section 545 of the Family Court Act raising the age to 21 years or longer in the discretion of the court is an ex post facto law. An ex post facto law has been defined as follows in People ex rel. Taylor v. Jennings (134 Misc. 586, 589-590): “ 1. Every law that makes an action, done before the passing of the law and which was innocent when done, criminal, and punishes such action. 2. Every law that aggravates the crime or makes it greater than it was when committed. 3. Every law that changes the punishment and inflicts a greater punishment than was annexed to the crime when committed. 4. Every law that alters the legal rules of evidence and permits the reception of less or different testimony than the law required at the time of the commission of the offense in order to convict the offender. (Calder v. Bull, 3 Dall. 386; Kring v. Missouri, 107 U. S. 221; Hartung v. People, 22 N. Y. 95.) ”
Moreover, an ex post facto law is limited to criminal legislation. (Calder v. Bull, supra.) Therefore, since paternity proceedings are not criminal, this objection cannot be applied to section 545 of the Family Court Act or to former subdivision 2 of section 69 of the New York Criminal Courts Act. But even accepting this objection, which I do not, section 545 contains none of the elements of an ex post facto law. The sole objection, which respondent, could advance is that a “ greater punishment ” was imposed by section 545 in extending the support to 21 years. This is not true since under the old subdivision 2 of section 69 the court had the power upon good cause shown to extend the age to 21 years or longer in the discretion of the court. The new section 545 eliminates the good cause shown requirement and extends the period of support to 21 years. Under both the old and the new law, support could be extended beyond 21 years for good cause shown in the discretion of the court. Therefore, section 545 does not meet any of the elements of an ex post facto law even if we assume that the proceedings are criminal in nature since a “ greater punishment ” has not been imposed.
Although the respondent does not raise the point, it might be well to examine other possible objections, which are raised in civil actions, to wit: a claim that section 545 violates the United States -Constitution (art. I, § 10) that “ No State shall * * * pass any * * # Law impairing the Obligation of Contracts ”, and that clause of the Fifth Amendment against depriving any person of property without due process of law.
*497 The respondent has no contractual or vested right in the amount or duration of the order. A vested right is one which cannot be taken away by statute. The court had the power both under the old and the new law to increase or decrease the amount of the order, had continuing jurisdiction over it and had the power to extend it beyond 21 years. The respondent availed himself of one of these rights by applying for and receiving a decrease in the amount of the order.
Another argument the respondent could advance is that when subdivision 2 of section 69 was interpreted in Commissioner of Welfare of City of N. Y. v. Richter (286 App. Div. 1068 [1st Dept., 1955]) the words “for good cause shown” were held to mean that the petitioner was required to show “ some unusual or exceptional circumstance ” to obtain an extension of the order beyond 16 years of age. A divided court held that ‘ ‘ the continuance of a high school education [was] an ordinary circumstance and not within the statutory provision ’ ’. However, there was a strong dissent, which in my opinion supports present-day opinion that it is highly important for children to continue their education. I feel that there is grave doubt that the same result would be reached by the majority of the courts today for reasons which will be discussed later. Moreover, there can be no guarantee that the court would continue this particular interpretation ad infinitum. In view of present-day attitudes on education, it is indeed doubtful. Certainly a court decision is far from a vested right, for we have seen many precedents of long years standing being reversed or modified not only by the Supreme Court of the United States but also by our own Court of Appeals. Therefore, I place no great reliance that the view adopted in the Commissioner of Welfare v. Richter (supra), constitutes any type of vested right or that it would be followed today. Frequently legislation has been passed to correct conditions and judicial interpretations. It can be urged that section 545 of the Family Court Act does.
The present approach for passing upon retroactive statutes is set forth in Matter of Bailey v. Bush Term. (178 Misc. 1045, revd. 265 App. Div. 758, affd. 291 N. Y. 534) where the court said (pp. 1049-1050):
‘‘ Except for ex post facto laws (a phrase long settled as referring only to penal laws [cases cited] and laws impairing the obligation of contracts * * #) neither the Federal Constitution nor the Constitution of New York, contains any prohibition against retroactive laws as such [cases cited] but retroactive laws may be invalid under the due process of law clauses of both Constitutions [cases cited] and, as I believe, *498 under the equal protection of the laws clauses also. (See Welch v. Henry, 305 U. S. 134.) Laws which attempt retroactively to create a liability in relation to a transaction as to which no liability previously had attached generally are so arbitrary, harsh, and oppressive that it is perhaps accurate to say of them that they -are presumptively invalid (see Graham & Foster v. Goodcell, 282 U. S. 409, 426), but too numerous and varied are the instances in which such laws have been sustained to permit the broad generalization that such laws necessarily are unconstitutional. (Danforth v. Groton Water Co., 178 Mass. 472, 477, quoted in Robinson v. Robins Dry Dock & Repair Co., 238 N. Y. 271, 277.)
“Various attempts have been made to draw broad distinctions to differentiate between valid and invalid retroactive laws, such, for example, as those which relate to remedies and those which relate to substantive rights, those which affect non-vested as distinguished from vested rights, those which cure non-jurisdictional defects as distinguished from jurisdictional defects, those which validate the invalid and those which invalidate the valid; but while not wholly useless such broad distinctions invariably break down at one point or another, and no amount of blinking can obscure the fact that even so-called ‘ remedial ’ statutes may in effect impose a liability where none existed before (see Jacobus v. Colgate, 217 N. Y. 235) and that even so-called ‘ curative ’ or ‘ enabling ’ or ‘ validating ’ statutes either do the same thing or else destroy rights which are vested in every sense except that the court has allowed the retroactive statute to divest them. (See, for an exceptionally able and constructive discussion, Smith, Retroactive Laws and Vested Rights, 5 Texas L. Rev. 231; 6 id. 409; reprinted in 2 Selected Essays on Constitutional Law, pp. 266-300.) The true approach, the one I take to be the one now adopted in authoritative cases, seems to me to be to refuse to judge retroactivity in the abstract or per se and appraise the operation and effect of the statute with a view to all its elements, including but not viewing alone its retroactivity, and determine from the entire setting whether its operation and effect in that particular setting are so harsh, arbitrary, and oppressive, as to constitute a denial of due process of law (or of the equal protection of the laws); and that seems to me but another way of repeating that the test of constitutionality is not an absence of retroactivity, but an absence of a denial of due process or of equal protection.” (The cases cited by the court have been omitted due to the length of the quotation.)
*499 A later article entitled “ The Supreme Court and the Constitutionality of Retroactive Legislation” appears in volume 73 of the Harvard Law Review at page 692.
Looking at section 545 of the Family Court Act with these tests in mind, let us examine and appraise the operation and effect of the statute including its retroactivity, harshness, arbitrariness and oppressiveness. Several points should be made concerning the operation and retroactivity of the new section 545. Under the old law the court could continue the support but only upon “ good cause shown ”. This would compel an application to the court in each instance and would undoubtedly result in a wide divergance of opinion as to what constituted the “ good cause ”. Obviously, a statute depending upon judicial construction for practically every situation is undesirable. A perfect example is found in Sheehan v. North Country Community Hosp. (273 N. Y. 580) where the Court of Appeals established the distinction between administrative and medical acts upon the part of a hospital in determining whether there was liability for its negligence. The court held that the hospital could only be held for administrative acts not medical. The result was that each case had to be decided by an appellate court to determine the nature of the act and finally the Court of Appeals in Bing v. Thunig (2 N Y 2d 656) wiped out the distinction. Here the same problem is presented and the new section 545 removed the “good cause ” requirement because the statute was not operating in a practical manner. Moreover, the public interest is served by the new section both financially and socially. The burden of supporting these children is placed where it properly belongs on the fathers. Many children will be enabled to continue their education who heretofore had to seek employment because no unusual or exceptional circumstances existed. The new section supports present-day thinking of the importance of children obtaining as much education as possible. The press has constantly carried appeals and reported plans for “ drop-outs ” to return to school and for children to continue their education. President Kennedy has allocated $250,000 to support special efforts to prevent drop-outs. The President said: “ A boy or girl has only a limited time in life in which to get an education, and yet it will shape their whole lives and the lives of their children.” The New York Mirror carried an editorial urging continuance in school on August 3, 1963. The New York Times printed a long account of the program on August 2 and August 3,1963. The State Commissioner of Education in a speech warned that drop-outs faced a job scarcity.
*500 Recently the Board of Education inserted an advertisement in the New York Daily Neivs urging children to continue their education. The point made was that a high school education was worth a quarter of a million dollars more during his lifetime than a person who did not graduate. Drop-outs lose $25 to $50 a week. Furthermore, large sums are being expended by government to train persons who had inadequate education so that they can become self-supporting. The new section 545 carries out this important step by extending the age of support to 21 years and thereby overcoming the interpretation of subdivision 2 of section 69 that some unusual or special circumstances are required. The trend today is that children should no longer be thrown upon their own resources at 16 years but are to be as well educated as possible for life. The new section is not harsh, oppressive or arbitrary since the respondent is adequately protected by the provision of the section which provides that the sum fixed shall be “ fair and reasonable ”.
There may be some who will claim that this extension will encourage idleness, loafing or a tendency to unduly prolong the educational program. This may be a possible objection but only time will tell and if it develops, then I am sure corrective legislation will be forthcoming. Certainly, the many who will benefit should not be penalized by the few who abuse it.
Therefore, applying the tests outlined above, I find that the new section 545 is highly desirable, more practical, operates well, does not violate any of the respondent’s constitutional rights in that it is neither harsh, arbitrary nor oppressive and does not constitute a denial of due process of law.
The Legislature has full power to pass or amend a Statute of Limitations, which was in effect what was done here. It is said that the Statute of Limitations may be recalled, altered, or withdrawn, subject only to the limitation that the effect of the later legislation must not be an interference with the right of contract or some other vested right. (2 Carmody-Wait, New York Practice, ch. 13, § 14, p. 181.)
If the age limitation of 16 years is considered a Statute of Limitations as was done in Commissioner of Welfare v. De Santos (4 Misc 2d 515) still the Legislature had the power and right to extend it as to all who were under 16 years at the time of the effective date of the amendment. In Moore v. State (43 N. J. L. 203, 213) the court said: “Until the fixed period has arrived, the statute is a mere regulation of the remedy, and, like other such regulations, subject to legislative control; but after-wards, it is a defence, not of grace, but of right; not contingent, but absolute and vested; and, like other such defences, not to *501 be taken away by legislative enactment ”. Applying these principles, the Legislature had the right to extend the age of support at any time before the child reached his sixteenth birthday, which is what was done.
I find that the respondent’s rights were in no wise violated by the enactment of section 545 of the Family Court Act.
Accordingly, the application to extend the order of support to 21 years is granted. In the event the child becomes self-supporting during this period of time, the respondent may apply to the court for such relief as he deems proper.
The present order is modified to provide for support of the child in the amount of $8 a week starting October 4, 1963. In the event the petitioner feels that this amount is inadequate, the matter should be rescheduled for a hearing as to adequacy.