J. Irwin Shapiro, J.
This is an application by the petitioner, an attorney, for a writ of habeas corpus on behalf of his client, one Harry Mencher.
James Beatty, a payroll guard, was shot to death in the course of a robbery committed in Queens County on May 10,1961. The relator’s client, Harry Mencher, one Peter Donovan, and others, were indicted for murder in its first degree in causing Beatty’s death. Mencher and Donovan were both convicted as charged, and the jury not having recommended life imprisonment, the court, in accordance with then controlling law, directed judgment on June 7,1962 that the convicts be executed (Penal Law, § 1044, subd. 2; §§ 1045,1045-a).
*111 Upon appeal, the judgment was reversed and a new trial was ordered (People v. Donovan, 13 N Y 2d 148, 154, 163). The indictment under which Donovan and Mencher were convicted has been superseded by the present indictment which likewise charges the two of them, along with one other, with having committed the crime of murder in its first degree.
The appeal was argued in the Court of Appeals on May 9, 1963. Six days earlier the Governor had approved an act amending the Penal Law and the Code of Criminal Procedure, in relation to punishment for murder in its first degree and kidnapping (L. 1963, eh. 994). So far as here pertinent, the statutory plan of punishment was changed so that the death penalty was no longer mandated, either upon a common-law conviction of deliberate and premeditated murder, or upon a jury’s failure to recommend life imprisonment, upon a defendant’s conviction of felony murder. Under the law, as amended, the basic punishment for ‘ ‘ [m]urder in the first degree is * * # life imprisonment” (Penal Law, § 1045, subd. 1).
Under subdivision 3 of that section it is provided that: “ When a defendant has been found guilty after trial of murder in the first degree, the court shall discharge the jury and shall sentence defendant to life imprisonment if it is satisfied that defendant was under eighteen years of age at the time of the commission of the crime, or that the sentence of death is not warranted because of substantial mitigating circumstances.”
If the defendant is not sentenced ‘ ‘ to life imprisonment as provided in subdivision two [dealing with a plea of guilty to murder in the first degree, and therefore not here applicable] or three of section ten hundred forty-five, it shall, as promptly as practicable, conduct a proceeding to determine whether defendant should be sentenced to life imprisonment or to death. Such proceeding shall be conducted before the court sitting with the jury that found defendant guilty unless the court for good cause discharges that jury and impanels a new jury for that purpose.” (Penal Law, § 1045-a, subd. 2.)
In the event the jury is impaneled for the purpose stated, and after receipt of instructions from the court “ on any matters appropriate in the circumstances, including the law relating to the possible release on parole of a person sentenced to life imprisonment ” (id., § 1045-a, subd. 4), it then proceeds to determine whether the defendant should be sentenced to life imprisonment or death (id., § 1045-a, subd. 5). In the course of the proceeding, evidence may be presented by either party on any matter relevant to sentence, but not limited to, the nature and circumstances of the crime, defendant’s background and history, and *112 any aggravating or mitigating circumstances and any relevant evidence, not legally privileged, shall be received regardless of its admissibility under the exclusionary rules of evidence (id., subd. 3).
The statutory scheme went into effect on July 1, 1963 and is applicable to all trials commenced on or after that day (L. 1963, ch. 994, § 11). It was on October 8, 1963 that the Court of Appeals rendered the decision, already referred to, reversing the judgment of conviction in this case so that the new trial ordered by it must perforce be governed by the now statutory enactments.
The statutory change in the manner of effecting life imprisonment, or the death penalty, does not change the definition of first degree murder nor does it in any manner affect the established rules normally governing the admission and consideration of evidence for determining the defendant’s guilt or innocence of that charge. The rule with respect to the kind of evidence which may be received deals solely with the second stage of the trial, i.e., that phase which is concerned with fixing the punishment.
Through his counsel, and by means of the present writ, defendant Mencher now challenges the legality of his detention to answer the charge of murder on the ground that, as to him, the changes in the law are ex post facto, and that they therefore cannot be applied to him. He urges that since the repeal of the former law carried with it no saving clause he may not now be prosecuted under either statute and must, therefore, be set free.
The District Attorney in addition to opposing the application on the merits also opposes it as premature. He contends that the defendant may be acquitted, or may be found guilty of a degree of homicide less than first degree, or that the court, in the event of a conviction of murder in its first degree, may impose life imprisonment and that therefore the defendant’s application should not be entertained at this time. I hold that the validity of the statute is determinable by reference to what may happen thereunder in any alternative and not merely by reference to what verdict actually results upon the trial of the indictment (Lindsey v. Washington, 301 U. S. 397; Beavers v. Henkel, 194 U. S. 73, 83). The objection that the application is premature is, therefore, rejected and the writ is considered on the merits.
The constitutional interdiction of ex post facto laws (IT. S. Const., art. I, §§ 9,10) reaches out to (1) every law which makes criminal an act done before its enactment but which was then innocent; (2) every law that aggravates a crime or makes it greater than it was when committed; (3) every law that changes the punishment and inflicts a greater punishment than the law *113 affi±ed to the crime, when committed; and (4) every law that alters the legal rules of evidence and receives less, or different evidence than the law required at the time of the commission of the offense, in order to convict the offender or (5) otherwise deprives the accused of any substantial right or immunity possessed by him at the time when he is said to have committed the offense charged (Mallett v. North Carolina, 181 U. S. 589, 597; Malloy v. South Carolina, 237 U. S. 180, 183-185; Calder v. Bull, 3 U. S. 386; People ex rel. Pincus v. Adams, 274 N. Y. 447).
Defendant Mencher contends that his case is within categories 3 and 4 above mentioned, because (a)" the new law “ changes the punishment and actually serves to inflict a greater punishment ’ ’ and because (b) damaging evidence of his background and previous criminal career may be brought to the attention of the jury in the second stage of the trial, whereas such evidence was scrupulously excluded under the former procedure.
Taking up these propositions in their inverse order, I hold the contention made by the defendant that the new statute is ex post facto as to him because of the different kind of evidence permissible at the second stage portion of the trial to be without merit. The nature of the evidence admissible in the sentencing proceeding does not in any wise modify, change, lessen, or otherwise affect the rules of evidence on the trial to prove a defendant’s guilt of murder, nor does it have any relevancy or pertinency whatever until after the return of a verdict of guilt and until the court, in the first instance, decides to submit the matter to a jury for its determination. Under the Penal Law and the Code of Criminal Procedure, as they existed prior to the enactment of chapter 994 of the Laws of 1963, the jury in certain capital cases (felony murder) was empowered to recommend life imprisonment. Such a recommendation was not binding upon the court (People v. Ertel, 283 N. Y. 519, 523), although it made possible the exercise of a discretionary imposition of a sentence to life imprisonment (Ann. 138 A. L. R. 1241). In determining whether to exercise its discretion to impose a sentence of life imprisonment, in place of a death sentence, the court was required to obtain the defendant’s criminal record, including any reports that might have been made as a result of a mental, psychiatric or physical examination of the defendant, and in addition, the court had the power ex parte, to seek any information that would aid it in determining the proper sentence to be imposed (Code Grim. Pro,, § 482). The nature of the information so secured and so considered could constitutionally be any relevant evidence regardless of its admissibility under the exclusionary rules of evidence (Williams v. New York, 337 *114 U. S. 241). Thus, there is no basic change in the type of evidence or information which could be considered by the sentencing power under the old law, the Justice presiding at the trial, or which may be followed in giving the facts to the sentencing power, the jury, under the new procedure and the mere statutory change which substitutes the finding of a jury for that of a Judge may not be held to be unconstitutional as an ex post facto law (Winston v. State, 186 Ga. 573; State v. Caldwell, 50 La. Ann. 666; Marion v. State, 20 Neb. 233; People ex rel. Chandler v. McDonald, 5 Wyo. 526) nor does the change in the kind of evidence admissible constitute the law an ex post facto one (Thompson v. Missouri, 171 U. S. 380; Williams v. New York, supra).
In the Thompson case (supra) the defendant was convicted of murder in the first degree largely upon the evidence that he had written a certain prescription for strychnine and a threatening letter to the deceased who died of strychnine poisoning. The defendant’s authorship was proved by a comparison with letters written by the defendant to his wife. The Supreme Court of Missouri reversed the judgment of conviction holding that the admission of the letters to the defendant’s wife constituted prejudicial error. Between the time of the reversal and the second trial an act was passed which permitted such letters to be received in evidence and the defendant was again convicted. The Supreme Court of Missouri affirmed and so did the United States Supreme Court as against a contention that the change in the law of evidence which permitted new and different evidence to be heard was ex post facto as to the defendant. Said the Supreme Court of the United States.(pp. 386-387): “ Applying the principles announced in former cases * * * we adjudge that the statute of Missouri relating to the comparison of writings is not ex post facto when applied to prosecutions for crimes committed prior to its passage. If persons excluded upon grounds of public policy at the time of the commission of an offense, from testifying as witnesses for or against the accused, may, in virtue of a statute, become competent to testify [see Hopt v. People of Territory of Utah, supra, 110 U. S. 574, 4 S. Ct. 202, 28 L. Ed. 262], we cannot perceive any ground upon which to hold a statute to be ex post facto which does nothing more than admit evidence of a particular kind in a criminal case upon an issue of fact' which was not admissible under the rules of evidence as enforced by judicial decisions at the time the offense was committed. The Missouri statute, when applied to this case, did not enlarge the punishment to which the accused was liable when his crime was committed, nor make any act *115 involved in Ms offence criminal that was not criminal at the time he committed the murder of which he was found guilty. It did not change the quality or degree of his offence. Nor can the new rule introduced by it be characterized as unreasonable; certaiMy not so unreasonable as materially to affect the substantial rights of one put on trial for crime. The statute did not require ‘ less proof, in amount of degree, ’ than was required at the time of the commission of the crime charged upon him. It left unimpaired the right of the jury to determine the sufficiency or effect of the evidence declared to be admissible, and did not disturb the fundamental rule that the State, as a condition of its right to take the life of an accused, must overcome the presumption of his innocense, and establish his guilt beyond a reasonable doubt.”
It must therefore be obvious that a law which merely changes the evidentiary procedure not on the trial dealing with the defendant’s guilt or innocence, but on the trial of the question of what punishment is to be meted out is valid. The very contention here raised with respect to the change of evidence rule on the subject matter of punishment was raised and rejected in two cases which both of the parties to this writ have apparently overlooked and which, I am persuaded, lays down sound principles for guidance here (People v. Ward, 50 Cal. 2d 702, cert. den. 359 U. S. 945; Ward v. State of California, 269 F. 2d 906, 907-908).
There, as here, the defendant had complained that the change in procedure 1 ‘ altered the situation to his substantial disadvantage and constitutes the enactment of an ex post facto law ” in that it permitted the reception of evidence of his jail and juvenile court records in that portion of the proceeding conducted for the purpose of determining the penalty that would be attached to the conviction of murder (50 Cal. 2d 708).
Answering that contention and analyzing the California statute which figured, in part at least, in the studies preceding the amendment of the New York law, the California court said (pp. 710-711) that it was “ apparent that the Legislature in enacting section 190.1 ‘ did not make that a criminal act which was innocent when done; did not aggravate an offense or change the punishment and make it greater than when it was committed ; did not alter the rules of evidence, and require less or different evidence than the law required at the time of the commission of the offense; and did not deprive the accused of any substantial right or immunity possessed by ’ the defendant at the time of the commission of the offense * * *. The changes effected by the enactment constituted merely an altera *116 Mon in the conditions deemed necessary for the orderly and just conduct of criminal trials and did not deprive the defendant of any substantial personal right within the meaning of the constitutional prohibitions of ex post facto 1'aws ”.
The United States Court of Appeals for the 9th Circuit (Ward v. State of California, 269 F. 2d 906, 907-908), in refusing to hold the California statute ex post facto as to the defendant, agreed with the reasoning and conclusions of the California court saying:
11 While it is true that § 190.1 permits the introduction of evidence ‘ of the defendant’s background and history, and of any facts in aggravation or mitigation of the penalty ’, — evidence which would not have been admissible at a trial under the law as it existed at the time of the history of the offence, yet * * * a statute admitting evidence not previously receivable is not an ex post facto law * * *.
‘1 It is to be noted here that the new type of evidence allowed was not evidence received at the trial where his guilt or innocence was determined. It was received only at a stage of the proceedings where the sentence or penalty was to be determined after the verdict of guilty of the crime charged had been returned. * * * It seems plain that the new procedure * * * is merely a part of the State’s sentencing procedure * * * as that term is used in Williams v. People of State of New York, 337 U. S. 241, 69 S. Ct. 1079, 1083, 93 L. Ed. 1337. * * * But Williams * * * supra, pointed out the sharp distinction between rules governing trial of guilt or innocence on the one hand, and sentencing procedures on the other, and noted the ‘ sound and practical reasons ’ for the distinction. In that case the Supreme Court held that it was not a denial of due process for the sentencing judge * * * to use information contained in reports of probation officers which referred to many prior offenses on the part of the accused. If New York could validly make such matters available to the sentencing judge it would appear to be no denial of due process for California to permit such matters to be made available to a sentencing jury.”
Upon the basis of its conclusion a certificate of probable cause was denied and a stay of execution was refused (Ward v. State of California, supra, pp. 906, 907-908).
The foregoing cases make it crystal clear that a procedural change making it possible for the sentencing power, be it court or jury, to consider the defendant’s prior record and any and all other pertinent information, including hearsay, is not an *117 ex post facto law within the meaning of that term (see, also, Malloy v. South Carolina, 237 U. S. 180, supra).

This disposes of the defendant’s contention that the cha/nge in the hind of proof which may be offered against him on the question of sentence is an ex post facto law.

The remaining contention of the defendant is that the possible change in punishment, under certain circumstances, from death to life imprisonment is ex post facto as to him, and in support of this claim he leans most heavily on Hartung v. People (22 N. Y. 95 and 28 N. Y. 400) and Shepherd v. People (25 N. Y. 406).
Hartung is completely inapposite. There, the statute in effect at the time of the commission of the homicide by the defendant provided for the punishment of death on conviction. That statute was repealed and in place thereof the new statute provided that ‘ When any person shall be convicted of any crime punishable with death, and sentenced to suffer such punishment, he shall, at the same time, be sentenced to confinement at hard labor in the state prison until such punishment of death shall be inflicted ”. (22 N. Y. 95, 97.) It further provided that “ No person so sentenced or imprisoned shall be executed in pursuance of such sentence, within one year from the day on which such sentence of death shall be passed ”. (22 N. Y. 95, 97.) The only point actually decided in the Hartung cases was that the revised statutes so far as they attempted to subject the defendant to both the punishment of death and previous imprisonment at hard labor was ex post facto and void (see Mongeon v. People, 55 N. Y. 613, 616 and the like evaluation of Hartung in Malloy v. South Carolina, 237 U. S. 180, 185, and in State ex rel. Pierre v. Jones, 200 La. 808, 817). There an additional punishment was added to the punishment in existence at the time Hartung committed the crime. That additional punishment was imprisonment at hard labor for a year before the possible imposition of the death penalty. Under the circumstances, it is clear that the attempt by statute to impose additional punishment over and above that prescribed by the law in existence at the time of the commission of the crime m'ade it an ex post facto enactment. That is not the situation here.
In Shepherd, the defendant was convicted of arson in the first degree. At the time when the crime charged was committed the punishment prescribed by statute for arson in the first degree was death. It was thereafter changed to imprisonment in one of the State prisons at hard labor for life. Agreeing that “ A law, the effect of which is simply to reduce or diminish the punishment with which an act was punishable when committed, cannot be an ex post facto law, because it inflicts no new or addi *118 tional punishment ” (25 N. Y. 406, 415) the court nevertheless held that the new law was ex post facto as to the defendant because “ [i]mprisonment for life at hard labor is an entirely different kind or manner of punishment, from punishment,by death * * * The two punishments have no elements in common” (25 N. Y. 406, 415).
The Shepherd case can be distinguished from the case at bar because of the “ hard labor ” provision but it may not be denied that various parts of the opinion lend succor to the defendant’s contentions here and are so broad in scope that Corpus Juris Secundum cites it as a holding, representative of the minority opinion, that “ an act changing the punishment from death to imprisonment for life ” is ex post facto (16A C. J. S., Constitutional Law, p. 153).
In Shepherd the court said (p. 415): “ It is plain, then, that the moral or philosophical disquisition as to whether imprisonment for life at hard labor is better or more desirable or less severe than death, has really nothing to do with the question whether the act of 1860, assuming that it was intended to have a retrospective operation, is, so far, ex post facto or not. Imprisonment for life at hard labor is an entirely different kind or manner of punishment, from punishment by death. The act of 1860 entirely changed the punishment for arson in the first degree. In changed it from death to imprisonment for life. The two punishments have no elements in common. If it should be held that the act of 1860 merely diminished the punishment with which the prisoner’s crime was punishable when committed, because imprisonment for life at hard labor is generally considered a more lenient punishment than death, or one which the criminal would prefer to suffer, then it could be held that a law changing the punishment of an act from imprisonment for a certain number of days or months to a fine, or from a certain number of stripes to imprisonment for a certain number of days, was not ex post facto, because the court might think the new punishment more lenient than the old, or that the criminal would prefer to suffer the new punishment.”
■However, the opinion must be read in the setting of what was actually decided — and not the dicta — and the proposition actually decided was that the substitution of imprisonment at hard labor for life in place of a death sentence could not be held to be an act which “ merely diminished the punishment with which the prisoner’s crime was punishable when committed”.
However, I prefer to rest my determination here not alone on the distinction made of .Shepherd because of the change from the death penalty to life imprisonment at hard labor but on *119 what I believe to be the sounder and more enlightened view that a law which changes punishment is not in and of itself an ex post facto law unless that change inflicts a greater or additional punishment (Calder v. Bull, 3 U. S. 386, supra; Mallett v. North Carolina, 181 U. S. 589, supra; People ex rel. Pincus v. Adams, 274 N. Y. 447, supra), or affects “ the offender unfavorably ” and that “No act that mollified the rigor of the criminal law was regarded as an ex post facto law ’ ’ (People v. Hayes, 140 N. Y. 484, 491, 492).
In this day and age, and applying the teachings of our JudeoChristian heritage, it may not be doubted that “ A law, which changes the punishment from death to imprisonment for life, is a law mitigating the punishment, and therefore not ex post facto ” (Shaw, O. J., in Commonwealth v. Wyman, 12 Cush. [66 Mass.] 237, 239). (See, also, to .the same effect Commonwealth v. Vaughn, 329 Mass. 333; Commonwealth v. Gardner, 11 Gray [77 Mass.] 438; McGuire v. State, 76 Miss. 504.)
It should be recalled that the conclusion by the court in Shepherd that the provision for the change of sentence from death to imprisonment for life at hard labor was an alteration but not a mitigation of sentence and was, therefore, subject to the Constitution’s ban against ex post facto laws was reached just 100 years ago. That conclusion was premised on the claimed inability of the court to determine whether people would not prefer the death penalty to life imprisonment. Since that determination, we have, unfortunately, accumulated a vast experience on the subject of comparisons of the general attitude of people toward the death penalty as contrasted with indefinite terms of imprisonment, including life incarceration. We have seen how the Nazis used the threat of death to corrupt and destroy hum'an beings and to turn them into virtual animals. We have seen how, when faced with a choice between death and slow starvation in concentration camps, the election invariably was to hang on to life, no matter how awful and degraded and tortured. We have seen how, in the case of our own soldiers, the overweening fear of death was used to break resolution and to bring about repudiation of everything held dear by some of those who had the misfortune to become war prisoners of the enemy forces in Korea.
Unfortunately, in these times, with the advent of newer and newer nuclear destructive forces, the fear of death is everywhere and the fact becomes unmistakably clear that death, the ultimate punishment, is greater than life imprisonment, and that the latter is a reduction or mitigation of the ultimate and irrevocable penalty of death. The court’s inability in the Shepherd *120 case to compare death with life and to come to the legal conclusion that one was a lesser penalty than the other should not prevent a present-day realistic approach to the problem for death, and its opposite state, life, are now ever present in our thoughts. They always can and do act as a basis for comparison. When the school-aged child cowers under a desk in an atom bomb drill, he has this fact brought home to him. When our statesmen talk casually of the use of small atomic weapons in a local war simply to defoliate the landscape, .they all underline the fact that the fear of death is something with which all of us must reckon at all times in these days, unlike the pre-atom days of the Civil War during which the Shepherd ease was decided. It may appear ironic to belittle the fear of death when speaking of a period during the Civil War, the first war in which mass civilian armies were used and so many soldiers died. Yet, ours is an age in which the threat of mass death exists for all of us from the cradle on. Ours is an age which has witnessed for the first time in the history of civilization a deliberate policy of mass starvation and extermination being adopted by modern governments. It is for this reason that I believe that no court should now hesitate to determine that a sentence of life imprisonment is a minimization of the penalty of death.
Certainly, this was the view of the Legislature, a view which is in no way inconsistent with even the broadest reach of the ban of ex post facto laws. For this reason, also, this court has no hesitation in ruling that the action of the Legislature in placing added safeguards around any proposal to impose the death penalty is an action in mitigation of the previously existing penalty provisions and does not, therefore, offend against the ban on ex post facto legislation. The courts in other States that have had occasion to pass opinion on this subject have come to the same conclusion.
In McGuire (76 Miss. 504, supra) the court held that a legislative enactment providing for a change of punishment from death to life imprisonment was the imposition of a different but not greater punishment and did not come within the constitutional prohibition against ex post facto laws.
In Vaughn (329 Mass. 333, supra) the change in the law from death to life imprisonment carried with it a declaration of permanent ineligibility for parole. Answering the defendant’s attack on the law as ex post facto, the court said (p. 339): “ The declaration of permanent ineligibility for parole is not an ex post facto law as applied to the defendant. At the time of the murder his rights under a conviction of murder in the first degree were confined to a mandatory sentence of death. G. L. (Ter. Ed.) *121 c.,265, § 2. He would not have had the benefit of GL L. (Ter. Ed.) c. 127, § 154A, inserted by St. 1935, c. 225, as amended by St. 1939, c. 451, § 53. In the absence of executive clemency, he could never have received parole. Now that he has been made the beneficiary of a statute permitting imprisonment for life, he cannot complain that the benefits were not even greater.”
In People v. Hayes (140 N. Y. 484, 492, supra) the court said: ‘ ‘ I think where a change is made in the matter of punishment, if the change be of that nature which no sane man could by any possibility regard in any other light than that of a mitigation of punishment, the act Would not be ex post facto where made applicable to offenses committed before its passage.”
In summary, therefore, it is obvious that prior to the enactment of the new statutory scheme, conviction of murder committed from a deliberate and premeditated design to effect the death of the victim would be common-law murder, for which the only punishment prescribed was death. As noted, in the case of a felony murder, if the jury accompanied the verdict of guilty with a recommendation, the court could accept, or reject, that recommendation. The new section, 1045, for the reasons above set forth, does not increase or aggravate the punishment previously imposed. In the first instance, it changes the punishment for any murder in the first degree to life imprisonment, and it is only if the court refuses the imposition of such punishment that a sentencing proceeding before a jury is commenced, and in that case the punishment cannot be any greater than the punishment specified in the old statute. The change of the punishment which may be imposed in the first instance, from death to life imprisonment, is under all of the circumstances an amelioration, mitigation and lessening of the punishment which may not be deemed to be an ex post facto law. That New York public policy considers life imprisonment to be an amelioration and mitigation of the death penalty runs throughout the fabric of our law, for the right of a jury to recommend life imprisonment (under the old law) is instinct with a declaration that the recommendation is for a lesser punishment.
For the reasons above set forth the court has concluded that the new statutory enactments are not ex post facto as to the defendant (McKinney’s Cons. Laws of N. Y., Book 1, Statutes, § 51, p. 66). The writ is therefore dismissed and the District Attorney is directed to submit a judgment on this determination (see, CPLB 7010, subd. [c]).